# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
## January 7, 2004 Session

## MARTHA M. BOOTE v. HELEN BOOTE SHIVERS ET AL.

### Appeal from the Chancery Court for Marshall County
### No. 12099     J. B. Cox, Chancellor

### No. M2003-00560-COA-R3-CV[1] - October 21, 2005

This appeal involves a challenge to an antenuptial agreement. Following the death of her husband, the decedent's wife filed a petition in the Chancery Court for Marshall County to have her husband's will and two codicils admitted to probate in solemn form. She later discovered that a third codicil that would have dramatically increased her share of the estate had not been properly revoked. When the trial court rebuffed her efforts to have the third codicil admitted to probate, she filed a petition to dissent from the will and to seek an elective share of the estate and one year's support. The decedent's daughters opposed the petitions based on an antenuptial agreement the wife had entered into with the decedent, and the wife challenged the enforceability of the antenuptial agreement. Following a bench trial, the court set aside the antenuptial agreement after finding that the decedent's wife did not enter into the agreement knowledgeably and without duress. The decedent's daughters appealed. We have determined that the antenuptial agreement is enforceable.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Andrée Sophia Blumstein and William L. Harbison, Nashville, Tennessee, for the appellants, Helen Boote Shivers and Linda Boote Gerritsen.

Walter W. Bussart and Lee Bussart Bowles, Lewisburg, Tennessee, for the appellee, Martha M. Boote.

---

[1]On April 30, 2003, this court entered an order consolidating the present appeal with another appeal arising out of the same probate case. The appeals were argued together before this court. For the sake of simplicity, this opinion deals solely with *Boote v. Shivers*, No. M2003-00560-COA-R3-CV. An opinion in *In re Estate of Boote*, No. M2002-02234-COA-R3-CV is being filed concurrently herewith. This court has previously issued a decision in yet another appeal arising out of the same probate case. *Estate of Boote v. Shivers*, No. M2003-02656-COA-R3-CV, 2005 WL 1277867 (Tenn. Ct. App. May 27, 2005) (No Tenn. R. App. P. 11 application filed).

**OPINION**

**I.**

Joseph Owen Boote, Jr. met Martha McCaleb Lingner ("Ms. Boote") in the late spring or early summer of 1990. They were introduced through Mr. Boote's daughter, Linda Boote Gerritsen, who had met Ms. Boote one day while shopping in Green Hills. Ms. Gerritsen told Ms. Boote that her father was recently widowed, that he needed to get out and have some fun, and that she thought her father and Ms. Boote would enjoy each other's company. She gave her father's telephone number to one of Ms. Boote's friends, and soon thereafter, Mr. Boote was invited to a brunch to meet Ms. Boote. The two hit it off immediately, and in October of 1990, Mr. Boote proposed. Ms. Boote accepted, and the couple set a December 28, 1990 wedding date.

Mr. Boote and Ms. Boote had much in common. Mr. Boote was eight-three years old, and Ms. Boote was seventy-four. Mr. Boote had two grown daughters and grandchildren from his prior marriage, while Ms. Boote had one grown daughter and grandchildren of her own. Mr. Boote and Ms. Boote had both been previously widowed. They had also been successful in business. Mr. Boote had been an executive at Aetna prior to his retirement and had amassed a substantial fortune as a result of investments he made very early on in the Lay's Potato Chip Company. Ms. Boote owned a radio station and several commercial properties in Lewisburg, Tennessee, and she had owned and operated a paint store in Lewisburg for many years before selling it in 1981.

Soon after he proposed to Ms. Boote, Mr. Boote set up a meeting with his lawyer, Michael D. Sontag of Bass, Berry & Sims. Mr. Boote wanted to know what effect his marriage to Ms. Boote would have on his ability to decide how his estate would be distributed when he died. Mr. Sontag explained the legal rights of spouses in the property of the other in the event of death or divorce and informed him that these rights could be curtailed or eliminated through the execution of a well drafted antenuptial agreement. At Mr. Boote's request, Mr. Sontag prepared just such an antenuptial agreement. The body of the agreement was six pages long and stated, in relatively straightforward language, that neither party would receive anything from the other in the event of divorce. It also provided that if Ms. Boote died during the marriage, Mr. Boote would take nothing from her estate, but if Mr. Boote died during the marriage, Ms. Boote would receive his interest in their personal residence as well as a life interest in a $600,000 marital trust.

The antenuptial agreement expressly stated that both parties were waiving all other legal rights, whether "statutory or otherwise," that they might acquire in the property of the other as spouses, specifically including the right to dissent from the other's will and take an elective share of his or her estate. It also contained the following paragraph entitled "Informed Consent by Martha":

> Martha declares that she fully understands the terms and provisions
> of this Agreement, that she has been fully informed of her legal rights
> and liabilities, that she believes the provisions of this Agreement are
> fair, just and reasonable, and that she signs this Agreement freely and

voluntarily, acting under the advice of her independent legal counsel, Daniel P. Whitaker, in Lewisburg, Tennessee.[2]

On November 15, 1990, six weeks before the scheduled wedding date, Mr. Sontag sent the antenuptial agreement to Mr. Whitaker for his review. Mr. Whitaker examined the agreement for some time before discussing it with Ms. Boote during the first week of December. At his meeting with Ms. Boote, Mr. Whitaker carefully reviewed the agreement and the effect of each provision and specifically separated the different consequences of divorce and death. Mr. Whitaker asked Ms. Boote several times whether she had any questions regarding the agreement. Each time, Ms. Boote responded, "No."

Mr. Whitaker did not discuss Mr. Boote's financial status with Ms. Boote in any detail because he did not think it was necessary. He was a friend of Ms. Boote's daughter and son-in-law and had heard from them that Mr. Boote was worth over eight million dollars. Mr. Whitaker assumed that Ms. Boote was aware of this figure. In addition, Mr. Whitaker viewed the agreement as being highly favorable to Ms. Boote because she would inherit Mr. Boote's interest in their personal residence plus a life interest in a $600,000 trust if he died during the marriage, but Mr. Boote would inherit nothing from her estate if she predeceased him.[3] After the meeting, Mr. Whitaker contacted Mr. Sontag and informed him that Ms. Boote would sign the antenuptial agreement.

On December 11, 1990, Mr. Sontag faxed Mr. Whitaker a financial disclosure statement showing that Mr. Boote was worth approximately $9.3 million. The following day, Mr. Whitaker attempted to contact Ms. Boote to obtain her financial disclosure statement but was unable to reach her. Ms. Boote's daughter agreed to prepare her mother's financial disclosure statement because she handled all her mother's business affairs. She prepared the statement showing Ms. Boote's net worth to be approximately $1.4 million and forwarded it to Mr. Whitaker on December 12, 1990. Mr. Whitaker faxed the disclosure statement to Mr. Sontag on December 13, 1990. He did not indicate in any way that Ms. Boote was having misgivings about the antenuptial agreement in light of the specifics of Mr. Boote's financial disclosure statement or that he needed more time to consult with her. Thus, with the wedding just fifteen days away, all that remained was for the parties to arrange a meeting for the signing of the antenuptial agreement.

Unfortunately, on the same morning Mr. Whitaker faxed Ms. Boote's financial disclosure statement to Mr. Sontag, Ms. Boote fell and broke both of her ankles. During the preceding weeks, Ms. Boote had been busily preparing for the wedding while at the same time going back and forth

---

[2]The agreement also contained an informed consent provision for Mr. Boote mirroring the one for Ms. Boote.

[3]Mr. Whitaker knew that financial disclosure statements for both parties were to be attached to the final agreement and that they had not yet been prepared and exchanged. Appended to the draft antenuptial agreement he received from Mr. Sontag on November 15, 1990 were two exhibits with the headings "Financial Disclosure Statement – J. Owen Boote" and "Financial Disclosure Statement – Martha Lingner," but apart from the headings, the exhibits were blank. Mr. Whitaker later testified that he would not have reviewed Mr. Boote's financial disclosure statement with Ms. Boote at the meeting even if he had had it because of his understanding that she was aware of the eight million dollar figure and because he viewed the agreement as being highly favorable to her.

between Lewisburg and Nashville to renovate a condominium in Bellevue that Mr. Boote had purchased for the couple to live in after the wedding.[4] Ms. Boote had traveled to Lewisburg on December 13, 1990 to retrieve supplies for the renovation when she fell down a flight of stairs at the radio station. Her employees rushed her immediately to the hospital in Marshall County, and Ms. Boote was transported by ambulance to Baptist Hospital in Nashville.

Ms. Boote's treating physician at Baptist Hospital was Dr. Stanley G. Hopp. He treated the right ankle by placing it in a splint, but the left ankle fracture was displaced and required surgery. Thus, on the evening of December 13, 1990, Dr. Hopp performed surgery to secure Ms. Boote's left ankle with a metal plate and six screws. There were no complications, and Ms. Boote was soon moved to a regular hospital room to recuperate. Ms. Boote experienced a great deal of pain in the days following the surgery. From December 14, 1990 through December 16, 1990, Ms. Boote received, among other medications, fifteen intramuscular injections of the narcotic analgesic Demerol to control the pain and seven injections of the antihistamine Vistaril to potentiate the effects of the Demerol.

When Dr. Hopp visited Ms. Boote on his morning rounds on December 17, 1990, he noted that she was in less pain and was recovering well from the surgery. Dr. Hopp authorized Ms. Boote to be discharged from the hospital later that day or the next day if she preferred.[5] Mr. Boote and Ms. Boote had decided not to postpone their wedding, although they had decided to move the ceremony from Nashville to Lewisburg and to scale back the reception considerably. Mr. Boote was also planning to spend the holidays in Alabama with his daughters and grandchildren and was not planning to return to Tennessee until shortly before the wedding.

Mr. Boote awakened Ms. Boote when he arrived at her room at around noon on December 17, 1990. One of the matters on his mind was the antenuptial agreement, and he told Ms. Boote that a man would be coming by with the agreement for them to sign. He asked Ms. Boote to sign the agreement and told her that the agreement would keep one of his daughters quiet and that he would take care of it later. Mr. Boote then left the room briefly and returned with Mr. Sontag. Despite the fact that Ms. Boote still had several medications in her system, Mr. Sontag did not think she appeared sedated or confused. [6]

Mr. Boote, Ms. Boote, and Mr. Sontag chatted for a few minutes about her accident and the upcoming wedding. Mr. Sontag then presented Ms. Boote with the two originals of the antenuptial agreement turned to the signature pages. He did not review the contents of the antenuptial agreement

_____

[4]Ms. Boote was personally renovating the condominium with the assistance of her daughter and granddaughter.

[5]A social worker interviewed Ms. Boote sometime between 8:00 a.m. and 4:00 p.m. regarding her discharge plan. According to the social worker's notes, Ms. Boote was able to provide detailed personal information and express her preferences at this meeting.

[6]Ms. Boote had received her final injection of Demerol and Vistaril between 2:00 a.m. and 3:00 a.m. that morning, and she had taken two tablets of the mild narcotic analgesic Darvocet at 7:30 a.m. and again at 11:30 a.m. She was also wearing a scopolamine patch for nausea that had been placed behind her ear prior to the surgery.

-4-

or the financial disclosure statements with Ms. Boote. Ms. Boote could not have read over the agreement again, even if she had desired to, because she did not have her glasses with her. Ms. Boote and Mr. Boote signed the two originals of the antenuptial agreement, and Mr. Sontag notarized their signatures and signed the agreement as counsel for Mr. Boote. Then Mr. Sontag and Mr. Boote left, and Ms. Boote went back to sleep. Mr. Sontag had been in Ms. Boote's hospital room for a total of no more than fifteen to twenty minutes.

Mr. Sontag had tried unsuccessfully to contact Mr. Whitaker before going to the hospital on December 17, 1990 to have Ms. Boote sign the antenuptial agreement.[7] After leaving the hospital, Mr. Sontag sent Mr. Whitaker the two signed originals along with a cover letter inviting him to telephone if he had any questions. Mr. Whitaker did not telephone Mr. Sontag. Instead, he signed the two originals as Ms. Boote's counsel and returned at least one of them to Mr. Sontag. Mr. Sontag later sent Mr. Boote a letter enclosing two copies of the fully executed agreement, one for Mr. Boote, and the other for Ms. Boote.

Ms. Boote was discharged from Baptist Hospital on December 18, 1990, ten days before the wedding. She stayed in a hospital bed at her daughter's home in Lewisburg for the next ten days and was unable to get up until the day of the wedding. Even then, she could not walk and participated in the ceremony in a wheelchair. After the wedding, Ms. Boote was carried up the stairs to an apartment above the radio station in Lewisburg where she and Mr. Boote stayed for approximately one month. The newlyweds then visited Florida for a time before returning to reside at the condominium in Nashville.

In spite of its inauspicious beginning, the marriage between Mr. Boote and Ms. Boote turned out to be an extremely happy one. Throughout the marriage, Mr. Boote and Ms. Boote had, by all accounts, a very close and loving relationship. He adored her, and she adored him. Before he met Ms. Boote, Mr. Boote had been deteriorating both physically and mentally after the death of his first wife. However, as one of Mr. Boote's friends explained, once Mr. Boote married Ms. Boote, it seemed as though he had found a new reason to go on in life. They were married for over ten years until Mr. Boote's death at the age of ninety-four on September 12, 2001.

At the time of Mr. Boote's death, his estate was worth approximately thirty-five million dollars. Ms. Boote hired her late husband's Lewisburg attorney, Thomas A. "Drew" Davidson, to assist her in having Mr. Boote's will admitted to probate. Mr. Boote had executed a 1991 will in conformity with the provisions of the antenuptial agreement and later executed three codicils, the first two in 1998, and the third in early 2000. The first codicil transformed the life interest in the $600,000 marital trust referred to in the antenuptial agreement into an outright bequest and nominated Ms. Boote to serve as the sole executrix for the estate. The second codicil did not alter

---

[7]Thus, at the time the antenuptial agreement was signed, Mr. Whitaker had not expressly given Mr. Sontag permission to contact his client directly or to have Ms. Boote sign the antenuptial agreement outside his presence. However, Mr. Whitaker apparently believed he had implicitly authorized Mr. Sontag to do so or thought Mr. Sontag's failure to contact him beforehand was of no consequence because he did not contact Mr. Sontag to object to what he had done or inform his client that there had been any impropriety.

the distribution to Ms. Boote, but the third codicil directed that Mr. Boote's residuary estate be divided into thirds and distributed in equal parts to Mr. Boote's two daughters and Ms. Boote after the payment of all estate taxes and expenses. The 1991 will had been drafted by Mr. Sontag, but Mr. Davidson prepared all three codicils.[8]

Mr. Davidson prepared a petition to admit the 1991 will and the two 1998 codicils to probate in solemn form. Ms. Boote was aware that her husband had executed a third codicil to his will, but she had never seen it. She asked him specifically about the 2000 codicil when Mr. Davidson met with her to review the probate petition. Mr. Davidson told her only that Mr. Boote had "revoked" it. He did not provide Ms. Boote with any of the details surrounding the alleged revocation, nor did he tell her that he had a copy of the 2000 codicil in his office safe. Ms. Boote signed the petition, and on September 26, 2001, Mr. Davidson filed it in the Chancery Court for Marshall County.

The trial court set a hearing on Ms. Boote's petition for November 15, 2001. Shortly before the hearing, Ms. Boote retained separate counsel to represent her in her individual capacity as a beneficiary of the estate. After the hearing, but prior to the entry of an order, Ms. Boote learned that the third codicil might not have been properly revoked.[9] Thus, on December 7, 2001, Ms. Boote filed a declaratory judgment petition requesting a hearing on whether the third codicil should be admitted to probate along with the earlier instruments. On December 14, 2001, the trial court entered an order admitting the will and the first two codicils to probate in solemn form. The order did not mention the declaratory judgment petition or the 2000 codicil. Mr. Boote's daughters filed a motion to dismiss the declaratory judgment petition, and Ms. Boote filed a motion for post-judgment relief from the December 14, 2001 order.

At a hearing on June 5, 2002, the trial court indicated that it planned to dismiss Ms. Boote's declaratory judgment petition and to deny her motion for post-judgment relief. Following the hearing, Ms. Boote filed a petition to dissent from the will and take an elective share of Mr. Boote's estate. She had already filed a separate petition for one year's support. In their answers to Ms. Boote's petitions, Mr. Boote's daughters asserted that the December 17, 1990 antenuptial agreement barred Ms. Boote from dissenting from the will and from seeking an elective share of the estate and one year's support. Ms. Boote claimed that the antenuptial agreement was unenforceable, and Mr. Boote's daughters responded that it was too late for her to challenge the antenuptial agreement.

In January 2003, the trial court conducted a five-day bench trial on the enforceability of the antenuptial agreement. Much of the testimony was from expert witnesses who testified regarding the effects Ms. Boote's recent surgery, pain, and medications had or could have had on her cognitive functioning when she signed the antenuptial agreement around noon on December 17, 1990. Ms. Boote's experts testified that she would have felt drowsy and sedated and, therefore, would have been less able than normal to understand complex decisions. They testified that Ms. Boote definitely

_____

[8]By the time Mr. Boote started executing codicils in 1998, he and Ms. Boote had sold their condominium in Bellevue and had moved to Lewisburg.

[9]The attempted revocation of the 2000 codicil is the subject of the opinion in *In re Estate of Boote*, No. M2002-02234-COA-R3-CV, which is being filed concurrently herewith.

-6-

would have been cognitively impaired to some degree, but they conceded that they could not quantify the level of impairment and that not everyone who received the same medications that Ms. Boote did would have been significantly impaired. They acknowledged that the level of cognitive impairment Ms. Boote actually experienced was insufficient to prevent her from talking, listening, interacting with others, understanding her discharge summary, or articulating her preferences when she signed the antenuptial agreement.

The expert witnesses testifying for Mr. Boote's daughters stated unequivocally that the medications Ms. Boote received from the time of her surgery through the day before she signed the antenuptial agreement could not have had any clinically significant effects on her cognitive functioning when she signed the antenuptial agreement around noon on December 17, 1990. As for the medications administered on the day of the actual signing, they noted the relatively short half-lives of Demerol and Vistaril and opined that the injection of these medications Ms. Boote received between 2:00 a.m. and 3:00 a.m. would have had no appreciable effect on her cognitive functioning approximately ten hours later when she signed the antenuptial agreement. They testified that Darvocet is a mild drug[10] that is commonly used by people who are conducting business affairs and that neither it nor the scopolamine patch[11] had any clinically significant effects on Ms. Boote's cognitive functioning at the time of the signing. They found it significant that the nursing notes in Ms. Boote's medical records did not contain any indication that she was sedated or disoriented on the day in question and that Ms. Boote's treating physician evidently believed she was not too drowsy or disoriented to decide whether to be released from the hospital that day or the next.[12]

On February 12, 2003, the trial court entered an order holding that the antenuptial agreement was unenforceable based on its findings that Ms. Boote had not entered into it knowledgeably and without duress. The trial court rejected the argument that Ms. Boote's challenge to the antenuptial agreement was barred by the statute of limitations and the equitable doctrines of laches, acquiescence, ratification, and estoppel. The trial court granted Ms. Boote's petition to dissent from the will and take an elective share of the estate and her petition for one year's support. Mr. Boote's daughters appealed.

## II.
### THE STANDARDS OF REVIEW

We turn first to the proper standards of review for the issues presented in this appeal. Because this is an appeal from a decision made by the trial court itself following a bench trial, the

---

[10]One expert witness described Darvocet as being only slightly stronger than Tylenol, and Ms. Boote's own expert witness testified that Darvocet is less potent than codeine.

[11]One of Ms. Boote's own expert witnesses testified that the scopolamine patch was not a big issue in the case.

[12]Dr. Hopp's deposition was read into the record at trial. He testified that when he visited Ms. Boote on December 17, 1990, she was capable of making the decision whether to be discharged that day or the following day. However, he also testified that in his view, something as important as an antenuptial agreement should be dealt with away from the hospital setting if possible.

now familiar standard in Tenn. R. App. P. 13(d) governs our review. This rule contains different standards for reviewing a trial court's decisions regarding factual questions and legal questions.

With regard to a trial court's findings of fact, we will review the record de novo and will presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." We will also give great weight to a trial court's factual findings that rest on determinations of credibility. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G. Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). However, if the trial judge has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

Tenn. R. App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000); *Taylor v. Trans Aero Corp.*, 924 S.W.2d 109, 112 (Tenn. Ct. App. 1995). Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App. 1992) (holding that an appellate court is bound to respect a trial court's findings if it cannot determine that the evidence preponderates otherwise). Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.

The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact, not to conclusions of law. Accordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001); *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998); *Hicks v. Cox*, 978 S.W.2d 544, 547 (Tenn. Ct. App. 1998); *McCormick v. Aabakus Inc.*, 101 S.W.3d 60, 62 (Tenn. Sp. Workers Comp. Panel 2000).

### III.
#### THE ENFORCEABILITY OF THE ANTENUPTIAL AGREEMENT

Mr. Boote's daughters assert that the trial court erred by concluding that the antenuptial agreement is unenforceable because Ms. Boote lacked sufficient knowledge of Mr. Boote's holdings as well as the legal effect of the agreement and because Ms. Boote signed it under duress. They assert that the knowledge possessed by Ms. Boote's lawyer should be imputed to her and that neither Mr. Boote nor the pressure of the pending marriage resulted in intimidation that was so severe that it would overcome the will of ordinary persons. We agree.

#### A.

It is well settled that antenuptial agreements are enforceable in Tennessee if certain prerequisites are met. Tenn. Code Ann. § 36-3-501 (2001); *Bratton v. Bratton*, 136 S.W.3d 595, 599

(Tenn. 2004); *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996). To be enforceable, an antenuptial agreement must have been entered into freely, knowledgeably, and in good faith and without the exertion of duress or undue influence. Tenn. Code Ann. § 36-3-501;[13] *Randolph v. Randolph*, 937 S.W.2d at 819; *Cary v. Cary*, 937 S.W.2d 777, 782 (Tenn. 1996). The burden of proof to establish these elements rests with the party seeking to enforce the antenuptial agreement. *Randolph v. Randolph*, 937 S.W.2d at 821. The existence of each element is a question of fact to be determined from the totality of the circumstances surrounding the negotiation and execution of the antenuptial agreement. *Randolph v. Randolph*, 937 S.W.2d at 821; *Cary v. Cary*, 937 S.W.2d at 782; *Perkinson v. Perkinson*, 802 S.W.2d 600, 603 (Tenn. 1990). While the participation of independent counsel representing each party is not the sine qua non of enforceability, it provides the best assurance that the legal prerequisites will be met and that the antenuptial agreement will be found enforceable in the future. *Randolph v. Randolph*, 937 S.W.2d at 822; *Bryant v. Bryant*, No. W2003-01906-COA-R3-CV, 2004 WL 948844, at *4 (Tenn. Ct. App. Apr. 28, 2004) (No Tenn. R. App. P. 11 application filed).

## B.
## Ms. Boote's Knowledge of the Relevant Facts

The trial court concluded that the financial disclosure statement prepared by Mr. Boote for attachment to the antenuptial agreement would have satisfied the disclosure component of the "knowledgeability" requirement.[14] However, even though Mr. Boote's lawyer provided a copy of the disclosure statement to Ms. Boote's lawyer six days before Ms. Boote signed the antenuptial agreement, the trial court concluded that Ms. Boote did not enter into the agreement "knowledgably" because Mr. Boote did not present the disclosure statement to her personally until mere moments before she signed the agreement. We have determined that the knowledge of Ms. Boote's lawyer of the contents of the disclosure statement can be properly imputed to Ms. Boote based on the facts in this case.

In reaching its decision to invalidate the antenuptial agreement, the trial court acknowledged the well established rule that knowledge obtained by an attorney during the course and in the scope of his or her representation of a particular client is conclusively imputed to the client as a matter of law. *Bellar v. Baptist Hosp., Inc.*, 559 S.W.2d 788, 789 (Tenn. 1978); *Neilson v. Weber*, 107 Tenn.

---

[13]Tenn. Code Ann. § 36-3-501 provides as follows:

> Notwithstanding any other provision of law to the contrary, except as provided in § 36-3-502, any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage which is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

[14]*Cf. Randolph v. Randolph*, 937 S.W.2d at 821 ("Though not required, a fairly simple and effective method of proving disclosure is to attach a net worth schedule of assets, liabilities, and income to the agreement itself.")

161, 165, 64 S.W. 20, 21 (1901); *Winstead v. First Tenn. Bank N.A., Memphis*, 709 S.W.2d 627, 632 (Tenn. Ct. App. 1986). However, the trial court concluded that it could not apply the rule of attorney-client imputation in the present case because of "the public policy behind the scrutiny of [antenuptial agreements] required by [Tenn. Code Ann. §] 36-3-501 and the cases relative to that." The trial court cited no authority in support of this observation.

It is well settled that "[k]nowledge of facts learned by an attorney in the course of his [or her] employment will be imputed to his client." *Bellar v. Baptist Hosp., Inc.*, 559 S.W.2d at 789; *see Neilson v. Weber*, 107 Tenn. at 165, 64 S.W. at 21.[15] As this court has previously explained, a "person generally is held to know what his attorney knows and should communicate to him, and the fact that the attorney has not actually communicated his knowledge to the client is immaterial." *Smith v. Petkoff*, 919 S.W.2d 595, 597-98 (Tenn. Ct. App. 1995); *accord Lane-Detman, L.L.C. v. Miller & Martin*, 82 S.W.3d 284, 296 (Tenn. Ct. App. 2002). Once it has been established that the attorney obtained the relevant knowledge during the course of representing the client, "the constructive notice thereof to the client is conclusive, and cannot be rebutted by showing that the attorney did not in fact impart the information so acquired." *Smith v. Petkoff*, 919 S.W.2d at 597-98; *accord Winstead v. First Tenn. Bank N.A., Memphis*, 709 S.W.2d at 632.

Neither the trial court nor Ms. Boote has advanced a persuasive argument for carving out an exception to the well established rule of attorney-client imputation for cases involving the execution of antenuptial agreements. The rule is one born of necessity, and it is routinely applied in civil and criminal cases alike. *Moody v. Moody*, 681 S.W.2d 545, 546 (Tenn. 1984) ("Counsel's knowledge must be attributed to his client, if the actions of the court are to have any efficacy."); *Roberts v. State*, 546 S.W.2d 264, 265 (Tenn. Crim. App. 1977); Annotation, *Imputation of Attorney's Knowledge of Facts to His Client*, 4 A.L.R. at 600-02. Moreover, the Tennessee Supreme Court has expressly recognized that "representation by independent counsel may be the best evidence that a party has entered into an antenuptial agreement voluntarily and knowledgeably." *Randolph v. Randolph*, 937 S.W.2d at 822. We find no indication in Tenn. Code Ann. § 36-3-501 or the cases relating to the execution and enforcement of antenuptial agreements that the normal rules applicable to the attorney-client relationship should somehow be altered simply because the case involves an antenuptial agreement. Accordingly, the trial court erred in finding that Ms. Boote did not enter into the antenuptial agreement "knowledgeably."[16]

---

[15]See also W.A.E., Annotation, *Imputation of Attorney's Knowledge of Facts to His Client*, 38 A.L.R. 820, 820-24 (1925); Annotation, *Imputation of Attorney's Knowledge of Facts to His Client*, 4 A.L.R. 1592, 1602 (1919) ("according to all cases, a client is chargeable with knowledge acquired by his attorney in transacting the business in which he was employed").

[16]In light of our conclusion that the trial court erred in refusing to apply the rule of attorney-client imputation, we need not address Mr. Boote's daughters' further argument that the evidence in the record preponderates against the trial court's finding that Ms. Boote did not have "independent knowledge of the full nature, extent, and value of [Mr. Boote's] property and holdings." *Randolph v. Randolph*, 937 S.W.2d at 822.

## Evidence of Duress Exerted on Ms. Boote

The trial court also found that Ms. Boote did not enter into the antenuptial agreement without "duress." The trial court explicitly rested its finding of duress on Mr. Boote's statement to Ms. Boote in the hospital on December 17, 1990, "Sign it, it will keep Helen [one of his daughters] quiet. And I will take care of it later." Mr. Boote's daughters argue that this statement was barred by Tennessee's version of the Dead Man's Statute, Tenn. Code Ann. § 24-1-203 (2000), that the trial court erred as a matter of law in admitting it, and that the trial court's finding of duress based on this statement must therefore be reversed. They also argue that even if the trial court did not err in admitting the statement, the evidence in the record preponderates against the finding that Ms. Boote entered into the antenuptial agreement under duress. We will address each argument in turn.

Tennessee's Dead Man's Statute provides that in "actions or proceedings by or against executors . . . in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator . . . unless called to testify thereto by the opposite party." Tenn. Code Ann. § 24-1-203. The Tennessee Supreme Court has described the statute's operation as follows:

> All cases from all jurisdictions hold that the statute was primarily intended to guard against an evil which might result from testimony of the living against the dead; that death having silenced the one, the law silences the other.

*Newman v. Tipton*, 191 Tenn. 461, 464-65, 234 S.W.2d 994, 996 (1950).

The purpose of the statute is to protect decedents' estates from fraudulent or fictitious claims. *Watts v. Rayman*, 62 Tenn. App. 333, 337, 462 S.W.2d 520, 522 (1970); *Baker v. Baker*, 24 Tenn. App. 220, 231, 142 S.W.2d 737, 744 (1940). It accomplishes this purpose by placing all parties in an action involving a decedent's estate on the same footing. *Estate of Jones v. Hawkins*, No. 85-236-II, 1986 WL 9607, at *6 (Tenn. Ct. App. Sept. 3, 1986) (No Tenn. R. App. P. 11 application filed). However, the Tennessee Supreme Court has repeatedly instructed that it must be construed narrowly in favor of the admission rather than the exclusion of evidence. *See, e.g.*, *Newman v. Tipton*, 191 Tenn. at 465, 234 S.W.2d at 996; *Grange Warehouse Ass'n v. Owen*, 86 Tenn. 355, 365, 7 S.W. 457, 460 (1888).

Ms. Boote and Mr. Boote's daughters disagree regarding whether the Dead Man's Statute applies in proceedings challenging the enforceability of an antenuptial agreement. In *Baker v. Baker*, this court squarely held that the statute does not apply in an action to set aside an antenuptial agreement. *Baker v. Baker*, 24 Tenn. App. at 230-32, 142 S.W.2d at 744-45. However, almost sixty years later, this court upheld a trial court's exclusion of an administratrix's testimony based on the Dead Man's Statute in a suit challenging the enforceability of an antenuptial agreement. *Cantrell v. Estate of Cantrell*, 19 S.W.3d 842, 845-46 (Tenn. Ct. App. 1999). One commentator has suggested that most courts that have addressed the issue have followed the approach taken in

*Cantrell.* Steve Planchon, Comment, *The Application of the Dead Man's Statutes in Family Law*, 16 J. AM. ACAD. MATRIM. LAW. 561, 570-72 (2000).

This comment is of questionable value given that the author appears to have overlooked both the *Cantrell* and the *Baker* decisions. In addition, both Tenn. Code Ann. § 36-3-501 and the case law require an inquiry into the circumstances surrounding the negotiation and execution of an antenuptial agreement before it can be enforced. Any rule that categorically excludes all testimony by parties regarding transactions with and statements by a testator or testatrix might well hamstring this inquiry in a significant number of cases. In any event, we need not resolve the tension between *Baker* and *Cantrell* in the present case because we agree with the trial court that Mr. Boote's daughters opened the door for the admission of the statement at issue.

At trial, counsel for Mr. Boote's daughters repeatedly objected to Ms. Boote's testimony regarding statements Mr. Boote made to her about the antenuptial agreement. The trial court sustained these objections based on the Dead Man's Statute. However, at one point during cross-examination when counsel for Mr. Boote's daughters was questioning Ms. Boote especially vigorously regarding whether Mr. Boote ever misled her with respect to the signing of the antenuptial agreement, Ms. Boote responded by referring to the statement in question. Counsel for Ms. Boote argued that the question opened the door to the admission of Mr. Boote's statement, and the trial court agreed. The court continued to exclude Ms. Boote's testimony regarding other statements Mr. Boote made to her on the basis of the Dead Man's Statute. We have reviewed the trial transcript in detail, and we agree with the trial court's determination that the questioning opened the door for the admission of the particular statement at issue. *Estate of Jones v. Hawkins*, 1986 WL 9607, at *6-7; *In re Estate of Russell*, 52 Tenn. App. 320, 332-37, 373 S.W.2d 226, 231-33 (1961); *see also* NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 6.01[5][j] at 6-20 to 6-21 (4th ed. 2000).

However, we also agree with Mr. Boote's daughters that even when this statement is considered, the evidence in the record preponderates against the trial court's finding that Ms. Boote entered into the antenuptial agreement under duress. Duress consists of unlawful restraint, intimidation, or compulsion that is so severe that it overcomes the mind or will of ordinary persons. *Johnson v. Ford*, 147 Tenn. 63, 86, 245 S.W. 531, 538 (1922); *Dockery v. Estate of Massey*, 958 S.W.2d 346, 348 (Tenn. Ct. App. 1997). The evidence in the record does not establish duress either at the time Ms. Boote signed the agreement or at any other point during the course of the negotiation and execution of the antenuptial agreement.

At first blush, the circumstances under which Ms. Boote signed the antenuptial agreement do seem troubling. After all, she was in the hospital, she had been taking pain medications for several days, and neither her attorney nor any member of her family was present. On the other hand, her treating physician had already cleared her to be discharged from the hospital, she and Mr. Boote had decided not to postpone their wedding as a result of the accident, she was able to converse with Mr. Sontag and Mr. Boote when they came to her hospital room, and she did not seem to Mr. Sontag to be sedated or confused at all. While Ms. Boote may not have been able to read over the antenuptial agreement again at that very moment because she did not have her glasses with her, she

had already been over the agreement in detail with her attorney and given her assent to its terms. In addition, as the trial court specifically found, it was reasonable for Mr. Sontag to assume that Ms. Boote had had an opportunity to review Mr. Boote's financial disclosure statement with her attorney if she so desired by the time Mr. Sontag came to her hospital around noon on December 17, 1990. Finally, Ms. Boote testified that Mr. Boote never took advantage of her or misled her in any way and that he did not force her to sign the antenuptial agreement. Accordingly, the evidence in the record preponderates against the trial court's finding that Ms. Boote was under duress when she signed the antenuptial agreement.

The statement by Mr. Boote admitted by the trial court adds little to the analysis. The trial court found that before Mr. Boote brought Mr. Sontag to Ms. Boote's hospital room, he said to her, "Sign it, it will keep Helen [one of his daughters] quiet. And I will take care of it later." Even if Mr. Boote had said nothing at all, it would have been obvious to Ms. Boote when he returned to her room with his lawyer and two originals of the antenuptial agreement in hand that he wanted her to sign them. Moreover, Mr. Boote's statement that he would take care of it later, or that he could do whatever he wanted in spite of the antenuptial agreement, was accurate. The antenuptial agreement only set a floor on what Ms. Boote could demand from Mr. Boote's estate. It did not in any way limit Mr. Boote's ability to provide her with additional sums on death or divorce by means of inter vivos transfers or a will. Mr. Boote did, in fact, dramatically increase the amount of his estate Ms. Boote was to receive over what was provided for her in the antenuptial agreement through the execution of codicils to his will. Thus, as the trial court acknowledged, most courts, including this one, would not consider this statement sufficient to create a state of duress.

More importantly, a review of the broader context reveals clearly that Ms. Boote did not enter into the antenuptial agreement under duress. Determining whether the prerequisites to the enforceability of an antenuptial agreement have been met requires an examination of the totality of the circumstances surrounding the negotiation and execution of the agreement. *Randolph v. Randolph*, 937 S.W.2d at 821; *Cary v. Cary*, 937 S.W.2d at 782; *Perkinson v. Perkinson*, 802 S.W.2d at 603. A narrow focus on the precise moment the parties' signatures were affixed to the agreement would be misguided.

Ms. Boote was represented by independent legal counsel throughout the process. Her attorney had a draft of the antenuptial agreement six weeks before the wedding, and he went over it with her line by line in his office three weeks before the wedding. At that point, she was sitting in her own attorney's office and was presumably able to speak freely and voice any reservations she might have had about entering into the antenuptial agreement. Instead, she told her attorney that she had no questions about the agreement, and she freely assented to the terms. Financial disclosure statements for both parties were exchanged a few days later. At no time before or after Ms. Boote signed the antenuptial agreement did she or her attorney ever express any hesitation about signing the antenuptial agreement or raise any concerns about the contents of the financial disclosure statements. To this day, Ms. Boote does not claim that she was unwilling to sign the antenuptial agreement or that she would have refused to sign it had she been personally presented with Mr.

Boote's financial disclosure statement sooner. Accordingly, the evidence in the record preponderates against the trial court's finding that Ms. Boote entered into the antenuptial agreement under duress.[17]

## IV.

The trial court's order setting aside the antenuptial agreement and granting Ms. Boote's petitions to dissent from the will and take an elective share of the estate and for one year's support is reversed and the case is remanded for further proceedings consistent with this opinion. The costs of this appeal are taxed to Martha M. Boote and her surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

---

[17]Ms. Boote argues that even if the trial court erred in finding that she did not enter into the antenuptial agreement knowledgeably and without duress, we should nevertheless affirm the trial court's judgment setting aside the antenuptial agreement because the evidence shows that she did not enter into the agreement "freely" and that it was not entered into "in good faith." This argument is meritless. The evidence in the record recited above that preponderates against a finding of duress also preponderates in favor of a finding that Ms. Boote entered into the antenuptial agreement freely. Moreover, Ms. Boote's own testimony at the trial established that Mr. Boote was a perfect Southern gentleman and a wonderful man, that he was not domineering or deceptive, that he was always very generous and kind to her, and that he never took advantage of her or misled her in any way. This description is the antithesis of bad faith.

As a result of our conclusion that the trial court erred in finding the antenuptial agreement unenforceable, we need not address Mr. Boote's daughters' argument that the trial court erred in holding that Ms. Boote was not precluded from challenging the enforceability of the antenuptial agreement based on the statute of limitations and the equitable doctrines of laches, acquiescence, ratification, and estoppel. However, we note that this court has previously suggested that it would be contrary to the public policy of Tennessee to apply the statute of limitations or equitable doctrines premised on delay in a manner that would effectively force a spouse who wanted to challenge the enforceability of an antenuptial agreement to do so prior to the dissolution of the marriage by death or divorce. *Baker v. Baker*, 24 Tenn. App. at 237, 142 S.W.2d at 748 ("There could hardly be anything better calculated to bring about domestic discord than for a wife [or husband] to do what the defendants in this case insist the complainant should have done [i.e., challenge the enforceability of the antenuptial agreement during the marriage]. It would hardly be in keeping with sound public policy to place such a burden upon a spouse.").