IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2019 Session

## DEBORAH JEAN WALKER v. BARRY LYLE WALKER

**Appeal from the Chancery Court for Williamson County**
**No. 34056     Joseph A. Woodruff, Chancellor**

_____

## No. M2018-01140-COA-R9-CV

_____

As part of this divorce action, Husband sought enforcement of an antenuptial agreement. Wife claimed the agreement was unenforceable because Husband failed to disclose a condominium he owned with a former girlfriend. After an evidentiary hearing, the trial court ruled that the antenuptial agreement was unenforceable because Husband did not enter the agreement in good faith. We conclude that Husband failed to meet his burden of proof at the evidentiary hearing. So we affirm.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. and RICHARD H. DINKINS, J., joined.

Russ Heldman, Franklin, Tennessee, for the appellant, Barry Lyle Walker.

Donald Capparella, Nashville, Tennessee, and Jacob A. Vanzin and Derek K. Smith, Franklin, Tennessee, for the appellee, Deborah Jean Walker.

## OPINION

## I.

## A.

In this interlocutory appeal, our sole concern is the enforceability of an antenuptial agreement between Barry Lyle Walker ("Husband") and Deborah Jean Walker ("Wife"). This was Wife's second marriage and Husband's first. Both parties entered the

relationship with a considerable amount of separate property. Wife owned and operated a day care business. Husband was a successful real estate developer.

During a few short weeks in the summer of 1996, the prospective couple negotiated and finalized the terms of an antenuptial agreement. Both parties were represented by counsel. Wife's attorney, Francene Kavin, drafted the agreement. Ms. Kavin directed the couple to prepare and exchange lists of their separate properties, including approximate values. Ms. Kavin also sent a draft agreement to the couple for review. Both parties discussed the draft and the subsequent proposed changes with their respective attorneys.

Five days before the wedding, Husband and Wife met with Ms. Kavin to sign the agreement. Each brought their respective lists of separate property, and Ms. Kavin attached the lists as exhibits to the agreement. Ms. Kavin also explained the various provisions of the agreement and gave each party the opportunity to ask questions. Apparently satisfied, they both signed the agreement.

A few months after the wedding, while working on Husband's property taxes, Wife discovered that Husband owned a condominium with his former long-term girlfriend, Melva Joyner. Husband had not included the condominium on his list of separate property or otherwise disclosed his ownership interest to Wife before the marriage. According to Wife, problems with Husband's former girlfriend had nearly derailed this relationship. So she was devastated by this discovery. But for the sake of the marriage, she chose not to take action at that time.

B.

Marital harmony proved elusive for Husband and Wife. Wife filed for divorce in 2001. The estranged couple later resolved their differences and dismissed the litigation. During this peaceful interlude, Husband and Ms. Joyner, with Wife's participation, sold the condominium to a third party.

In 2007, Wife filed another complaint for divorce. This second divorce action was suspended a year later when Husband was severely injured in a motorcycle accident. But the case resumed in earnest in 2015.

Husband moved for partial summary judgment, seeking a declaration that the antenuptial agreement was valid and enforceable. He supported his motion with a concise statement of undisputed material facts, his own affidavit, and a copy of the antenuptial agreement.

Wife argued that numerous factual disputes precluded the grant of summary judgment, including questions about the authenticity of the antenuptial agreement in the

2

record and inadequacies in Husband's disclosure of his assets and liabilities. Among other things, Wife faulted Husband for his failure to disclose his ownership interest in Ms. Joyner's condominium. She submitted multiple affidavits and depositions in opposition to Husband's motion.

In a detailed memorandum and order, the trial court denied the motion. The court was not persuaded that a genuine issue of material fact existed as to the authenticity of the antenuptial agreement. But with respect to Husband's disclosure, the court found genuine issues of material fact existed as to whether Husband's failure to disclose the condominium violated his duty of good faith and prevented Wife from entering the antenuptial agreement knowledgeably.

At Husband's request, the court bifurcated the proceedings, considering the validity and enforceability of the antenuptial agreement at a separate hearing. The court also ruled that the uncontroverted material facts, as specified in the order denying summary judgment, would be deemed established for purposes of the hearing. *See* Tenn. R. Civ. P. 56.05. The court directed the parties to focus their proof on the "factual circumstances surrounding whether Husband's failure to disclose his ownership interest in Ms. Joyner's condominium was inadvertent or intentional."

C.

At trial, Husband maintained that he entered the antenuptial agreement in good faith. He denied that he had deliberately hidden his ownership interest in the condominium. He had simply made a mistake. And, in any event, the omission was minor.

Husband and Wife began dating almost immediately after Husband ended a long-term relationship with Ms. Joyner. By all accounts, Ms. Joyner was less than pleased with this new state of affairs. And her continued presence in Husband's life caused ongoing friction between the new couple. After two years of dating, Wife broke off the relationship in part because of Ms. Joyner's interference.

According to Husband, during this separation, Ms. Joyner asked for his help in purchasing a condominium.[1] And until Wife confronted him, he believed he had merely provided a financial guaranty. But documents obtained from the Davidson County Register of Deeds Office revealed that, on June 19, 1996, Husband purchased the condominium as a tenant-in-common with Ms. Joyner. He also co-signed a promissory note and a deed of trust and other related documents. Husband did not deny that his

---

[1] Ms. Joyner offered corroborating testimony. But she was unable to recall any details about the condominium purchase.

signature appeared on the relevant documents. Rather, he claimed to lack both knowledge and understanding of what he had signed. According to Husband, he had walked into the closing, signed where indicated, and left. And no one had explained the legal effect of the documents he signed.

Husband maintained that, had he known about his ownership interest in the condominium, he would have disclosed it. Despite Ms. Joyner's involvement, he believed Wife "would have accepted it and moved on."

On cross-examination, Husband conceded that, as a real estate developer, he had participated in dozens of real estate closings. And he knew the difference between a warranty deed and a guaranty agreement. Even so, he claimed he never read the documents he signed at closings. He believed reading the documents to be a waste of time because he could not understand them.

Husband also filed the deposition of Wife's attorney, Ms. Kavin, as part of his case-in-chief. Ms. Kavin did not specifically remember the negotiation and execution of the antenuptial agreement. But she explained her general pattern and practice in similar situations. She was confident she would have explained to Wife her legal rights and liabilities under the agreement. And she would have provided Wife the opportunity to voice any concerns about the agreement.

But Ms. Kavin was not directly involved with the preparation of the separate property lists or the parties' disclosures. When she met with an engaged couple, she always stressed the importance of full disclosure. In her words, full disclosure meant that "the good, the bad, and ugly is disclosed so that the parties clearly know going into this what . . . [e]ach of them have." The lists represented "the culmination of the discussions between the parties." Ms. Kavin did not review the lists or conduct any independent investigation. She merely attached the lists provided by the parties to the final agreement.

For her part, Wife explained that Ms. Joyner had continuously attempted to disrupt her relationship with Husband. Frustrated with the situation, she had demanded that Husband sever all ties with his former girlfriend. And when he proposed on the Fourth of July, Husband assured her that he was no longer in contact with his former girlfriend. So she was shocked to learn that he had purchased a residence with Ms. Joyner a few short weeks before his proposal. She immediately confronted Husband. And he admitted he had kept silent because he was afraid of her reaction to the news.

Wife acknowledged that before she signed the antenuptial agreement, she read and understood the agreement's meaning and effect. And she had the opportunity to review Husband's property list. But it never occurred to her that he would deliberately omit a property interest. She trusted him. Wife maintained that she would never have entered

4

into the antenuptial agreement if she had known that Husband owned a residence with Ms. Joyner.

Testimony from Mimi Hurd, the closing attorney for the condominium sale, cast doubt on Husband's account of the condominium closing. Ms. Hurd prepared the closing documents, supervised the closing, and notarized the participants' signatures. Because she did not recall specific details of this closing, she described her normal pattern and practice for all closings. Her practice was to explain each document before it was signed. She would never have allowed a purchaser to walk in and sign documents at one of her closings without providing the necessary explanations.

Ricky Stegelman, a friend of Husband's, also contradicted Husband's version of events. He testified that Husband purchased the condominium with Ms. Joyner intending to live with her. He claimed that Husband told him about the purchase before the marriage. And then after the marriage, Husband had indicated that the purchase needed to be kept secret.

On rebuttal, Husband denied that Ms. Hurd had been present at the closing. He thought the closing attorney was male. And he reiterated that no one told him what he was signing. Husband dismissed Mr. Stegelman's testimony as a fabrication.

## D.

The trial court did not credit Husband's testimony. The court found that Husband did not enter the antenuptial agreement in good faith. Rather, he had deliberately concealed the fact that shortly before he proposed to Wife he had purchased a condominium with a former girlfriend. So the court ruled that the antenuptial agreement was unenforceable.

## II.

### A.

In a nonjury case, our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d). The evidence preponderates otherwise where the evidence "support[s] another finding of fact with greater convincing effect." *Boote v. Shivers*, 198 S.W.3d 732, 741 (Tenn. Ct. App. 2005). We give great weight to factual findings based on credibility determinations. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *Boote*, 198 S.W.3d at 740. Our review of questions of law is de novo, with no presumption of correctness. *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013).

5

Antenuptial agreements are enforceable in Tennessee only if certain statutory prerequisites are met. Tenn. Code Ann. § 36-3-501 (2017). The party seeking enforcement must establish by a preponderance of the evidence that the spouses entered the agreement "freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse." *Id.*; *see Randolph v. Randolph*, 937 S.W.2d 815, 821 (Tenn. 1996)(explaining that proponent of agreement has burden of proof). Whether each element is established "is a question of fact to be determined from the totality of the circumstances surrounding the negotiation and execution of the antenuptial agreement." *Boote*, 198 S.W.3d at 741. Once the statutory prerequisites are satisfied, we interpret and enforce antenuptial agreements like other contracts. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996).

Here, only two statutory elements were in dispute: knowledgeability and good faith. Before trial, the court determined that the only material facts at issue were the circumstances surrounding Husband's failure to disclose his ownership interest in Ms. Joyner's condominium.[2] And while Husband's failure to disclose the condominium impacted both the knowledgeability and the good faith inquiries, the trial court based its ruling solely on good faith. So the dispositive issue on this appeal is whether Husband met his burden of proving good faith.

The good faith element arises from the confidential relationship between prospective spouses. *See Randolph*, 937 S.W.2d at 821. Unlike arm's length transactions, good faith between an engaged couple requires more than honesty. *In re Estate of Davis*, 184 S.W.3d 231, 238 (Tenn. Ct. App. 2004) (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928), describing good faith in this context as "[n]ot honesty alone, but the punctilio of an honor the most sensitive"). The "highest degree" of fiduciary duty is required. *Id.* This high standard of conduct means that "fraud, oppression, or deception" can be more easily established. *See Bratton v. Bratton*, 136 S.W.3d 595, 601 (Tenn. 2004).

In the context of antenuptial agreements, our courts have not discussed the proof necessary to demonstrate good faith in great detail. *See, e.g.*, *Boote*, 198 S.W.3d at 746 n.17 (finding the argument that Husband did not enter the antenuptial agreement in good faith meritless in light of Wife's concession that he never misled her). But we have examined the concept of good faith in an analogous context, attorney fee agreements. *See, e.g.*, *In re Estate of Weisberger*, 224 S.W.3d 154, 161 (Tenn. Ct. App. 2006). Much

---

[2] Husband argues that the trial court failed to give sufficient weight and consideration to the material facts specified as being uncontroverted in the summary judgment order. We disagree. Many of the "facts" on which Husband relies are taken out of context. Husband also seeks to broaden the court's ruling to include facts beyond the scope of Rule 56.05. Rule 56.05 only grants the trial court the discretion to identify material facts not in substantial controversy, not to make factual findings. *See* Tenn. R. Civ. P. 56.05.

6

like prospective spouses, "[t]he relationship of attorney and client is an extremely delicate and fiduciary one" requiring the utmost good faith. *Cooper & Keys v. Bell*, 153 S.W. 844, 846 (Tenn. 1913). And proof of good faith is a prerequisite to enforcement of attorney fee agreements. *Alexander v. Inman*, 974 S.W.2d 689, 694 (Tenn. 1998). From these cases we gather that good faith may be established by evidence that "(1) the client fully understood the contract's meaning and effect, [and] (2) the attorney and client shared the same understanding of the contract." *Id.* Full understanding of the contract comes only after sufficient disclosure. *See Planters' Bank of Tenn. v. Hornberger*, 44 Tenn. (4 Cold.) 531, 571 (1867). The proponent of the agreement must show that the client was "fully and completely informed of the nature, result and consequences" of the agreement, including "each and every circumstance likely to influence his mind or feelings" about executing the agreement. *Id.*

Undisputedly, Husband failed to disclose the condominium he owned with Ms. Joyner before execution of the antenuptial agreement. While Husband insisted that his omission was an honest mistake, the trial court did not find his testimony credible. We find no basis in this record to overturn that credibility finding. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Husband was aware of Wife's feelings about Ms. Joyner. He conceded that Ms. Joyner had caused problems in his relationship with Wife especially before the marriage. The evidence does not preponderate against the trial court's finding that at the time the antenuptial agreement was negotiated and executed, Husband knew he owned a condominium with his former girlfriend and deliberately withheld this fact from Wife.

Husband had the burden of demonstrating that he had disclosed everything he knew that was likely to influence Wife's execution of the agreement. He failed to meet that burden. Wife testified that, had she known Husband had purchased a condominium with Ms. Joyner shortly before his proposal, she would not have executed the antenuptial agreement. So while Wife agreed at trial that she understood the meaning and effect of the antenuptial agreement, she lacked the full understanding requisite to a finding of good faith. *See Planters' Bank of Tenn.*, 44 Tenn. (4 Cold.) at 571.

Husband attempts to skirt his failure to meet his evidentiary burden by relying on the language of the antenuptial agreement itself. But the parties cannot avoid the statutory requirements by contract. *See Roberts v. Ray*, No. E2015-01522-COA-R3-CV, 2016 WL 1467576, at *5 (Tenn. Ct. App. Apr. 13, 2016). The proponent of an antenuptial agreement must prove that all the statutory elements have been met. *Randolph*, 937 S.W.2d at 821; *see also In re Estate of Davis*, 184 S.W.3d at 238 ("[I]it is the public policy of this state that agreements entered into between spouses or, in the case of antenuptial agreements, prospective spouses, are enforceable only if they are executed in good faith, knowledgeably, and without duress."). Without proof of good faith, the antenuptial agreement is unenforceable.

B.

As a final matter, Husband contends that the trial court erred in refusing to enforce the antenuptial agreement based on a theory of ratification. Husband asserted that Wife ratified the validity of the antenuptial agreement through conduct or silence after the agreement was executed. Wife filed a motion in limine seeking to preclude Husband from introducing evidence of ratification at trial. The trial court granted the motion, ruling that ratification was not a viable theory.

We normally review a trial court's decision on a motion in limine for an abuse of discretion. *Allen v. Albea*, 476 S.W.3d 366, 377 (Tenn. Ct. App. 2015). But Husband does not argue that he was unable to present evidence of Wife's post-contract conduct. Rather, he argues that the trial court erred in ruling that Tennessee law does not support Husband's proposed use of ratification. We review this legal question de novo. *See Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

Husband does not cite any Tennessee cases that apply ratification to enforce an otherwise unenforceable antenuptial agreement, and we have found none. Given the statute governing antenuptial agreements and the public policy of this State, we question whether postnuptial ratification may save an otherwise invalid agreement. *See In re Estate of Davis*, 184 S.W.3d at 238.[3]

Assuming for the sake of argument that ratification does apply, the conduct here does not evidence ratification. Ratification is often described as "confirmation after conduct." *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 270 (Tenn. 2001) (quoting *Gay v. City of Somerville*, 878 S.W.2d 124, 127 (Tenn. Ct. App. 1994)). To constitute ratification, the conduct must demonstrate an intent to affirm a voidable contract. *See Carnes v. Polk*, 44 Tenn. (4 Cold.) 87, 95 (1867); *Scott v. Buchanan*, 30 Tenn. (11 Hum.) 468, 476 (1850); *Hinton v. Robinson*, 364 S.W.2d 97, 102 (Tenn. Ct. App. 1962). According to Husband, Wife ratified the antenuptial agreement by acquiescing in the sale of the condominium to a third party, failing to challenge the enforceability of the antenuptial agreement sooner, and asking Husband to voluntarily terminate the antenuptial agreement. None of these actions evidence an intent to affirm the antenuptial agreement.

---

[3] Husband makes similar arguments concerning the doctrines of estoppel and waiver. But he never properly raised these theories in the trial court. *See Waters v. Farr*, 291 S.W.3d 873, 918 (Tenn. 2009) ("[A] party who fails to raise an issue in the trial court waives its right to raise that issue on appeal.). And even if he had, we find these theories equally inapplicable here. *See Baker v. Baker*, 142 S.W.2d 737, 747-48 (Tenn. Ct. App. 1940) (rejecting attempt to apply estoppel or laches to preclude spouse from challenging enforceability of antenuptial agreement); *accord In re Estate of Baker v. King*, 207 S.W.3d 254, 265 (Tenn. Ct. App. 2006).

8

C.

Wife requests an award of attorney's fees on appeal as a disadvantaged spouse. Finding no basis for such an award, we decline to award the requested fees.

**III.**

Because Husband failed to prove the antenuptial agreement was entered into in good faith, the agreement is unenforceable. So we affirm the trial court's decision. This case is remanded for further proceedings consistent with this opinion.

_____
W. NEAL MCBRAYER, JUDGE