IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 1, 2021 Session

FILED
04/26/2022
Clerk of the
Appellate Courts

## BARBARA MATTHEWS LAW v. HALBERT GRANT LAW, JR.

**Appeal from the Chancery Court for Hamilton County**
**No. 17-0883          Jeffrey M. Atherton, Chancellor**

_____

**No. E2021-00206-COA-R3-CV**
_____

On May 1, 1992, Barbara Matthews Law ("Wife") and Halbert Grant Law, Jr. ("Husband"), executed a prenuptial agreement. They married the following day. Wife filed for divorce in the Chancery Court for Hamilton County in December of 2017. The parties disputed, *inter alia*, the enforceability of the prenuptial agreement, as well as the classification and division of several assets. Trial was held over multiple days in 2019 and 2020, and the trial court entered its final decree divorcing the parties on July 31, 2020. The trial court held that the prenuptial agreement was valid and enforceable, classified the parties' assets, and divided the marital estate. Wife was awarded the parties' family home and $4,500.00 per month in alimony *in futuro*. Husband appeals, challenging the classification of the parties' home as marital property, as well as the classification of one bank account. Wife cross-appeals, challenging the enforceability of the prenuptial agreement and the classification of several assets. Wife also requests increased alimony. We affirm the trial court's finding that the parties' prenuptial agreement is valid and enforceable. We reverse the trial court's classification of three assets – the parties' home, a checking account, and an investment account. We vacate the trial court's decision as to those three assets and remand for proceedings consistent with this opinion. In light of the changes in classification of several major assets, we also vacate and remand the trial court's award of alimony for reconsideration.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded for Further Proceedings**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Phillip C. Lawrence, Chattanooga, Tennessee, for the appellant, Halbert Grant Law, Jr.

John P. Konvalinka & Lawson Konvalinka, Chattanooga, Tennessee, for the appellee, Barbara Matthews Law.

# OPINION

## I. BACKGROUND

Husband and Wife were married on May 2, 1992, when Wife was forty years old and Husband was forty-five. Wife had one son from a previous marriage, and the parties have one son, now an adult, together. Husband graduated from business school in the early 1970's and went to work for his family's successful automobile sales company, Newton Chevrolet, Inc. ("Newton Chevrolet"). In 1988, Husband purchased a home in Lookout Mountain, Tennessee, on West Fleetwood Avenue (the "Fleetwood house"). Husband did substantial renovations on the home before the marriage. Husband testified at trial that the house was used as collateral for a loan "briefly," and the record contains an amendment to a deed of trust securing a promissory note for $200,000.00, the security for which was the Fleetwood house. The amendment was executed on May 29, 1992, and refers to a note dated May 14, 1991.

By the time the parties married, Husband also owned one-hundred percent of Newton Chevrolet. The dealership was located in downtown Chattanooga on a tract of land comprised of approximately eleven acres (the "Downtown property"). The Downtown property was acquired by Newton Chevrolet many years before the parties' marriage. In 1991, Husband also acquired a Mitsubishi franchise ("Newton Imports") through a bankruptcy sale. Around the same time, Husband was also working on acquiring another franchise called Newton-Oldsmobile-GMC Truck, Inc. ("Newton GMC"). The land housing Newton Imports and Newton GMC (the "Chapman Road property") was comprised of several acres of land located in a different portion of Chattanooga. These parcels were acquired by Newton GMC in a series of acquisitions beginning in September 1992; Husband admitted at trial that the Chapman Road property was not acquired until after the parties had married and could not recall the exact details of the financing for that purchase.

While Husband brought significant separate property into the marriage, Wife had very little. Wife has a bachelor's degree in political science and completed some graduate level work prior to the marriage. She worked for a political action committee in Washington, D.C. in the 1970's. After moving to Chattanooga, Wife worked for several different attorneys keeping books, doing collections, and helping with title work. When the parties met in December of 1991, Wife was working as the office manager of a law firm and earning $35,000.00 per year. Husband and Wife started dating either in late 1991 or early 1992. Wife soon became pregnant, and the parties decided to marry. According to Husband, Wife wanted to marry quickly because of the pregnancy, and Husband did not object.

The parties planned to marry in North Carolina on May 2, 1992. Approximately two weeks before the wedding, Husband asked Wife to enter into a prenuptial agreement

(hereinafter, the "Agreement"). Wife agreed and, at some point, retained her own attorney. Husband's attorney prepared the Agreement. Wife met with her attorney at his office on April 30, 1992 to discuss the Agreement; however, Wife's attorney had not been furnished a copy at that point. Husband, on the other hand, spent two or three hours going over the Agreement with his attorney prior to the signing.

On May 1, 1992, the day before the wedding, Husband picked Wife up from her office, and they went together to Husband's attorney's office. Wife's attorney met them there, and Wife went with her attorney into a separate conference room. Husband's attorney brought the Agreement into Wife's conference room, and Wife maintains that the attorney informed her there would be no wedding if she refused to sign the Agreement. She also testified, however, that Husband never told her this, and Husband maintains that he never instructed his attorney to give Wife an ultimatum. Husband also testified that he would have married Wife regardless. Wife could not recall whether she asked for any changes to the Agreement. Attached to the Agreement was Husband's list of separate assets, which included the Fleetwood house and its furnishings, all three car dealerships, a Fidelity USA investment account, and a Fidelity IRA account. Husband's asset disclosure provided that the Fidelity IRA account contained $60,000.00 and the Fidelity investment account contained $178,000.00.

Wife testified at trial that the parties were at the office for approximately forty-five minutes, and Husband testified that they were not at the office for more than two hours. While the parties were executing the Agreement, twenty-five to thirty of Wife's relatives were en route to the parties' wedding. After executing the Agreement, the parties went straight to the airport to catch their flight to North Carolina, where they were married the following day. Ten days later, on May 12, 1992, the corporate charter for Newton GMC was issued.

The Fleetwood house was the parties' family home for the duration of the marriage. Wife was the primary caretaker for the parties' children, and Husband worked long hours and managed the parties' finances and community involvement. Around 2006, Husband decided to retire because the car dealerships were not doing well. Neither Newton GMC nor Newton Imports had ever turned a profit and were kept afloat with profits from Newton Chevrolet. In July of 2007, Newton Chevrolet was sold, resulting in a profit of $1,593,942.90. Husband retained the Downtown property and its appurtenant buildings, however, and rented it to the new owners of Newton Chevrolet. Husband testified that the profits from the sale of Newton Chevrolet, just the business, were put into "an investment that went bad during the Great Recession."

Newton Imports, Newton GMC, and the Chapman Road property were also sold in 2007 to a different buyer. Newton Imports' assets sold for $1,286,773.88; the sale of the

Chapman road property resulted in a profit of $4,628,487.00 to Newton GMC.[1]  The evidence of what happened to these profits is unclear.  At one point, Husband testified that the money was deposited into a Gerber Taylor investment account.  At a different point, Husband testified that the profits from the sale were deposited into his "Fidelity account."[2]

From 2016-2018, the Downtown property was parceled out and sold to various buyers, resulting in a profit of $8,648,589.70.  Husband testified that the proceeds from the sale of the Downtown property were eventually transferred to "either [his] checking account or [his] investment account at Fidelity, both at Fidelity."  The record shows that the proceeds from the sale of the Downtown property went into Husband's investment account, ending in 6395, and his checking account, ending in 2888.  Husband also testified that the Fidelity checking account was the account from which the family's monthly bills were paid, including the parties' car payments and money given to the parties' sons.

Wife filed her complaint for divorce in the Chancery Court for Hamilton County (the "trial court") on December 27, 2017, alleging marital misconduct and irreconcilable differences.  Wife sought property division, alimony, and attorney's fees.  An amended complaint was filed on February 27, 2018.  Husband answered the amended complaint on March 6, 2018, also alleging irreconcilable differences but denying marital misconduct as grounds for divorce.  Husband alleged cruel and inhumane treatment at the hands of Wife and alleged that Wife had made Husband's position intolerable.  Throughout the case, Wife maintained that Husband was unfaithful with multiple women and dissipated the marital estate substantially by spending money on said women.  Husband maintained that Wife was physically and verbally abusive.

Husband eventually sought summary judgment on the enforceability of the prenuptial agreement, which the trial court denied.  Although the parties attempted settlement through mediation, this was not successful.  Wife remained in the Fleetwood house during the pendency of this case, and Husband provided Wife $5,000.00 per month in temporary support.  Husband also paid Wife's car payment, health insurance premium, and the taxes and insurance on the Fleetwood house.  Nonetheless, Wife testified at trial that she had to withdraw money from her savings account to cover her living expenses while the case was ongoing, and maintained that she needed over $18,000.00 per month to cover her expenses.

While the divorce was pending, Husband desired to purchase his deceased mother's

---

[1] In the record, Newton Imports and Newton GMC are often referred to together as "Newton Mitsubishi-GMC" or "Newton GMC-Mitsubishi."

[2] Husband testified at trial that he maintained four different Fidelity accounts – a checking account and an ATM account, as well as the IRA and the investment account that were listed in the Agreement. Throughout his testimony, however, Husband testified as to his "Fidelity account" without clarifying which account he was addressing.  As discussed at length herein, this testimony has made our inquiry into the classification of the individual Fidelity accounts difficult.

home located at 933 Scenic Highway, Lookout Mountain, Tennessee (the "Scenic Highway house"). The Scenic Highway house is next door to the Fleetwood house. Husband sought the trial court's permission to purchase the home, which the trial court granted under certain conditions. Husband was ordered by the trial court to put an amount equivalent to the purchase price in a custodial account. The Scenic Highway house was purchased for the appraisal price of $900,000.00. The purchase was financed by a loan of approximately $720,000.00 and a HELOC on the Fleetwood house for $187,000.00, which covered the down payment. In accordance with the trial court's order, Husband withdrew $900,000.00 from his Fidelity investment account and put it in an account with FirstBank.

Trial was held on July 5, 2019, December 3, 2019, January 2, 2020, and January 3, 2020. The trial court heard from several witnesses in addition to the parties, including the attorney who handled the sale of the Downtown property, the pastor who married the parties, and Husband's accountant.[3] The additional assets at issue included the Gerber Taylor investment accounts totaling $1,482,564.22 at the time of trial, insurance policies, and various other investments of Husband. Ultimately, the proof showed that Husband had substantial separate property while Wife had none. The final decree, which contains detailed findings of fact and conclusions of law, was entered July 31, 2020.[4]

As relevant to the issues raised on appeal, the trial court's ruling can be summarized as follows: the prenuptial agreement is valid inasmuch as Wife entered into the agreement freely and knowingly without duress; Husband dissipated marital assets during the marriage by spending substantial sums of money on other women; the Fleetwood house was Husband's separate property by virtue of the prenuptial agreement but transmuted into marital property based upon the parties' treatment of the house as the marital home and the home having been maintained with marital funds; the custodial FirstBank account opened during the pendency of the divorce is a marital asset because it was opened while the parties remained married; and Wife is entitled to alimony *in futuro* in the amount of $4,500.00 per month due to her standard of living during the lengthy marriage, age,[5] lack of separate assets, and Husband's ability to pay.

With regard to the Fidelity accounts, the trial court classified some as Husband's separate property and some as marital property. The trial court found that the checking account was Husband's separate property because "Wife has not carried her burden to show that the account was marital[.]" The trial court found that the investment account, which held over five million dollars at the time of trial, could not be divided:

> The Court finds that $8,648,589.70 should be subtracted from the

---

[3] Some testimony was entered by deposition.
[4] The trial court declared the parties divorced without a finding of fault as to either party. *See* Tenn. Code Ann. § 36-4-129(b).
[5] Wife was sixty-seven at the time of trial.

value of this asset as the separate property of Husband from the sale of Newton Chevrolet. Because this subtraction renders this asset at a negative balance, the Court finds that this asset cannot be divided, even though Husband likely commingled funds in this account throughout the marriage. Thus, this asset has zero value to either party for the purposes of distribution.

The trial court then classified the Fidelity IRA and the Fidelity ATM account as marital. In its overall division of the marital estate, the trial court found:

> [T]he Court finds that Husband's separate property is $8,939,272.62 while Wife's separate property is zero. The Court finds that the total value of the marital estate is $4,832,176.33. The Court finds that Husband dissipated the marital estate in the amount of $180,000, and his share of the marital estate should be reduced by that amount. Therefore, based on the above evidence and reasons, the Court finds that Husband's share of the marital estate is $1,835,191.97, and Wife's share of the marital estate is $2,996,984.36. The Court finds that this division, while not numerically equal, is equitable based on the evidence and law.

The trial court also granted Wife her attorney's fees. After the final decree was entered, Wife filed her motion for fees, and the case was referred to Clerk & Master for an evidentiary hearing. The Clerk & Master's report was entered January 5, 2021, and the trial court's order confirming the report was entered January 27, 2021. Husband then timely appealed to this Court.

## II. ISSUES

We have rephrased and reordered the issues on appeal for clarity:

1.      Whether the trial court erred in finding the parties' prenuptial agreement valid and enforceable.

2.      Whether the trial court erred in classifying the Fleetwood house as marital property.

3.      Whether the trial court erred in concluding that Husband did not inextricably commingle funds in two of his Fidelity accounts.

4.      Whether the trial court erred in concluding that the FirstBank bank account is marital property.

5.      Whether Wife is entitled to additional alimony.

- 6 -

6.      Whether Wife should be awarded her attorney's fees on appeal.

## III. DISCUSSION

### a. The prenuptial agreement

In her posture as appellee, Wife challenges the trial court's ruling that the prenuptial agreement is valid. Because the outcome of this issue informs the rest of our analysis as to the parties' property, we address it first. Because this is an appeal from a bench trial, we review the trial court's factual findings *de novo*, presuming their correctness unless the evidence preponderates otherwise. *See Boote v. Shivers*, 198 S.W.3d 732, 740 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Apr. 24, 2006); Tenn. R. App. P. 13(d). "[F]or the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Boote*, 198 S.W.3d at 741. The presumption of correctness does not apply to the trial court's conclusions of law. *Id.* We ascribe great weight to the trial court's credibility determinations and will not re-evaluate those determinations absent clear and convincing evidence. *Id.* at 740 (citing *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)).

Tennessee's public policy favors prenuptial[6] agreements. *Perkinson v. Perkinson*, 802 S.W.2d 600, 601 (Tenn. 1990). These agreements are enforceable when entered into "freely, knowledgeably, and in good faith and without the exertion of duress or undue influence." *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996); *see also* Tenn. Code Ann. § 36-3-501.[7] These elements must be established by a preponderance of the evidence by the party seeking enforcement of the agreement, and the "existence of each element is a question of fact to be determined from the totality of the circumstances surrounding the negotiation and execution of the [agreement]." *Boote*, 198 S.W.2d at 741 (citing *Randolph*, 937 S.W.2d at 821). A "narrow focus on the precise moment the parties' signatures were affixed to the agreement would be misguided." *Id.* at 746. Although not dispositive, "the participation of independent counsel representing each party" is the "best assurance that the legal prerequisites will be met and that" the agreement will be enforceable. *Id.* at 741 (citing *Randolph*, 937 S.W.2d at 822).

---

[6] "Prenuptial agreements" are also known as "antenuptial agreements." *Ellis v. Ellis*, No. E2013-02408-COA-R9-CV, 2014 WL 6662466, at *4 (Tenn. Ct. App. Nov. 25, 2014).

[7] This statute provides:

> Notwithstanding any other law to the contrary, except as provided in § 36-3-502, any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

Here, based on all of the circumstances surrounding the Agreement's preparation and execution, Wife argues Husband failed to act in good faith. She takes particular issue with Husband's failure to provide a copy of the Agreement in a timely manner, as Wife and her counsel were only provided a copy the day of the Agreement's execution. She also asserts that given her pregnancy and the proximity in time to the parties' wedding, she acted under duress in signing the Agreement. We are unpersuaded by these arguments and agree with the trial court's conclusion that the Agreement is valid and enforceable.

As the proponent of the Agreement, it was Husband's burden to establish that Wife entered into the Agreement freely, knowledgably, and in good faith. In her appellate brief, Wife takes issue with the "good faith" element. Regarding this element, we have previously explained:

> The good faith element arises from the confidential relationship between prospective spouses. *See Randolph*, 937 S.W.2d at 821. Unlike arm's length transactions, good faith between an engaged couple requires more than honesty. *In re Estate of Davis*, 184 S.W.3d 231, 238 (Tenn. Ct. App. 2004) (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928), describing good faith in this context as "[n]ot honesty alone, but the punctilio of an honor the most sensitive"). The "highest degree" of fiduciary duty is required. *Id.* This high standard of conduct means that "fraud, oppression, or deception" can be more easily established. *See Bratton v. Bratton*, 136 S.W.3d 595, 601 (Tenn. 2004).
>
> In the context of antenuptial agreements, our courts have not discussed the proof necessary to demonstrate good faith in great detail. *See, e.g.*, *Boote*, 198 S.W.3d at 746 n.17 (finding the argument that Husband did not enter the antenuptial agreement in good faith meritless in light of Wife's concession that he never misled her). But we have examined the concept of good faith in an analogous context, attorney fee agreements. *See, e.g.*, *In re Estate of Weisberger*, 224 S.W.3d 154, 161 (Tenn. Ct. App. 2006). Much like prospective spouses, "[t]he relationship of attorney and client is an extremely delicate and fiduciary one" requiring the utmost good faith. *Cooper & Keys v. Bell*, 153 S.W. 844, 846 (Tenn. 1913). And proof of good faith is a prerequisite to enforcement of attorney fee agreements. *Alexander v. Inman*, 974 S.W.2d 689, 694 (Tenn. 1998). From these cases we gather that good faith may be established by evidence that "(1) the client fully understood the contract's meaning and effect, [and] (2) the attorney and client shared the same understanding of the contract." *Id.* Full understanding of the contract comes only after sufficient disclosure. *See Planters' Bank of Tenn. v. Hornberger*, 44 Tenn. (4 Cold.) 531, 571 (1867). The proponent of the agreement must show that the client was "fully and completely informed of the nature, result and consequences" of the agreement, including "each

and every circumstance likely to influence his mind or feelings" about executing the agreement. *Id.*

*Walker v. Walker*, No. M2018-01140-COA-R9-CV, 2020 WL 507645, at *4 (Tenn. Ct. App. Jan. 31, 2020). *Walker* specifically dealt with good faith as it relates to the preparation and execution of a prenuptial agreement. In that case, the wife was a business owner and the husband a successful real estate developer; both parties "entered the relationship with considerable separate property." 2020 WL 507645, at *1. The wife's attorney drafted the agreement, and both parties discussed it with their respective counsel. *Id.* The parties also exchanged lists of their separate assets. *Id.* While the agreement was executed and the parties married without issue, the wife soon discovered that the husband owned a condo with his ex-girlfriend. *Id.* The husband had not disclosed ownership of the condo on his list of assets. *Id.*

The wife eventually filed for divorce, and one of the issues at trial was the validity of the prenuptial agreement in light of the husband's failure to disclose ownership of the condo. Like Wife in the case at bar, the wife in *Walker* maintained that her husband failed to act in good faith. *Id.* at *2. The husband argued, however, that he did not realize he owned the condo and that the omission was a mistake; specifically, he maintained that he thought he was merely serving as a financial guarantor and had not read the documents at the closing of the sale of the condo. The trial court found the husband not credible and determined that the prenuptial agreement was executed in bad faith. *Id.* at *3. The agreement was therefore invalidated, and the husband appealed. *Id.* at *3.

This Court upheld the trial court's decision, concluding that the evidence did not preponderate against the finding that the "[h]usband knew he owned a condominium with his former girlfriend and deliberately withheld this fact from [w]ife." *Id.* at *5. We also noted the fact that the husband was a real estate developer, and the relationship between husband and his ex-girlfriend was a long-standing issue between the parties. *Id.* In light of the husband's omission, it was of no consequence that the wife "understood the meaning and effect of the antenuptial agreement," because she still "lacked the full understanding requisite to a finding of good faith." *Id.*

None of the behaviors exhibited by the husband in *Walker* have been displayed by Husband here, and the evidence does not preponderate against the trial court's factual finding that "Wife knew the contents of the documents and had a full opportunity to examine them." Considering the totality of the circumstances, we agree that Husband did not act in bad faith. He and Wife discussed the Agreement as early as two weeks before the wedding, and there is no indication that Wife at any point raised an objection to entering the Agreement. Moreover, Wife is an educated individual with experience in the legal industry and access to independent counsel.

While we agree with Wife that, ideally, she would have been provided a copy of

the Agreement earlier than the day of its execution, Wife spent forty-five minutes to two hours[8] going over the Agreement with her attorney prior to signing. Neither party could recall Wife having any particular objections to the terms of the Agreement; further, there has been no allegation, as there was in *Walker*, that Husband deliberately hid a major asset from Wife. Wife testified that prior to the marriage she knew about the Fleetwood house as well as Newton Chevrolet. While *Walker* provides that "[f]ull understanding of the contract comes only after sufficient disclosure[,]" there is no evidence of insufficient disclosure, or bad faith overall, in the present case. *Id.*

Wife also maintained at trial that Husband's attorney told her there would be no wedding should Wife refuse to sign the Agreement. In this sense, Wife's argument that the Agreement is marred by bad faith dovetails with her argument that she executed the Agreement under duress.

Prenuptial agreements must be entered into "without the exertion of duress or undue influence." *Randolph*, 937 S.W.2d at 819. Duress "consists of unlawful restraint, intimidation, or compulsion that is so severe that it overcomes the mind or will of ordinary persons." *Boote*, 198 S.W.3d at 745 (quoting *Johnson v. Ford*, 245 S.W. 531, 538 (1922)). Like the other requisite elements for a valid prenuptial agreement, duress should be considered in light of the broader circumstances. *Id.* at 746; *see also Howell v. Howell*, No. M2019-01205-COA-R3-CV, 2021 WL 408862, at *4 (Tenn. Ct. App. Feb. 5, 2021) (explaining that when considering duress, "circumstantial evidence of pressure" is relevant to totality of the circumstances inquiry).

The "legal definition of duress is rather stringent." *Ellis*, 2014 WL 6662466, at *11 (citing *Boote*, 198 S.W.3d at 145). In *Boote*, for example, we concluded that a prenuptial agreement was not executed out of duress, despite the fact that the wife signed it while in the hospital, post-surgery, and with the presence of multiple medications in her system. *Id.* at 735–38. Neither the wife's attorney nor any members of her family were present when the document was signed, and the parties' wedding was only ten days away. *Id.* at 745. Despite the somewhat "troubling" circumstances, the *Boote* Court opined that "the broader context reveals clearly that Ms. Boote did not enter into the antenuptial agreement under duress." *Id.* In particular, we noted that Ms. Boote had independent legal counsel throughout the process; her attorney had a copy of the agreement six weeks prior to the wedding; she and her attorney went over the agreement three weeks before the wedding; and neither Ms. Boote nor her attorney raised any objections to the terms. *Id.* at 746.

Likewise, we determined in *Ellis* that while the circumstances of a prenuptial agreement's execution placed pressure on the wife, the "stringent" requirements of legal duress were not satisfied. 2014 WL 6662466, at *11. In that case, the husband was forty-

---

[8] The parties did not agree at trial on how much time was spent at Husband's attorney's office on May 1, 1992. The trial court found, however, that neither party's testimony was more credible.

- 10 -

seven and owned a successful company, while the wife was thirty-one and worked in a factory. *Id.* at \*1. They were engaged in the spring of 1996, and the wife discovered she was pregnant in October 1996. After discovering the pregnancy, the wife quit her job and moved in with the husband. *Id.* The parties planned to marry in Las Vegas on December 26, 1996. *Id.*

The first time the wife was informed about the prenuptial agreement was after the husband called her on December 23, 1996, and asked the wife to meet him in a mall parking lot. *Id.* There, the wife was presented with a ring and the prenuptial agreement. *Id.* She was told that the parties would not marry and that she could not have the ring if she refused to sign. *Id.* The wife attempted to find an attorney before the wedding date but was unable to do so because of the short notice and proximity to the holidays. *Id.*

The foregoing circumstances lent themselves to the wife's argument that the agreement was not entered into freely, knowledgeably and in good faith, and the prenuptial agreement in *Ellis* was held unenforceable. *Id.* at \*11–12. This conclusion was not based on duress, however, and we ultimately concluded that despite the unfortunate circumstances, the wife was not under duress when the prenuptial agreement was executed. *Id.*

Here, we disagree that Wife entered the Agreement out of duress. Wife knew that Husband wanted a prenuptial agreement at least two weeks prior to the wedding and had no objections. Although Wife contends that Husband would have refused to marry Wife if she had not signed the agreement,[9] the evidence supporting this assertion is scant, at best. Wife urges on appeal that the rushed timeline of the Agreement's execution and proximity to the wedding amount to duress, but the record establishes that the parties agreed about marrying quickly. The circumstances of the parties' union were mutually agreed upon and do not amount to unlawful restraint, intimidation, or compulsion. Moreover, quite unlike the wife in *Ellis*, Wife was educated and familiar with the legal system. Wife was also represented by an attorney, whom she met with both the day before the Agreement was executed and on the day of execution. Consequently, the totality of the circumstances here does not satisfy the "rather stringent" requirements of legal duress. *Ellis*, 2014 WL 6662466, at \*11.

Husband satisfied his burden of demonstrating the validity of the Agreement.[10] We affirm the trial court's conclusion that the parties' prenuptial agreement is valid.

---

[9] Husband testified at trial that he would have married Wife regardless; Wife, however, testified that Husband's attorney told her that there would be no marriage if Wife did not sign. Again, however, the trial court did not conclude that either party's testimony was particularly credible as it related to the circumstances of the marriage.

[10] Wife's argument as to the Agreement focuses on the elements of good faith and duress. We note, however, that Husband also satisfied his burden as to the remaining requirements.

### b. The Fleetwood house

Having determined the prenuptial agreement is valid, we turn next to property classification and division. The classification of property as either separate or marital is "a question of fact to be determined in light of all relevant circumstances." *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245 (Tenn. 2009) (citing *Langford v. Langford*, 421 S.W.2d 632, 634 (1967)). The trial court's findings of fact are reviewed *de novo* with a presumption of correctness and "we must honor those findings unless there is evidence which preponderates to the contrary." *Snodgrass*, 295 S.W.3d at 245 (quoting *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007)). Conclusions of law, however, are reviewed *de novo* with no presumption of correctness. *Id.* at 245–46. Finally, the trial court's division of assets is afforded great weight on appeal, and that decision will not be disturbed "unless the distribution lacks proper evidentiary support, misapplies statutory requirements or procedures, or results in some error of law." *Id.*

Husband challenges the trial court's ruling that the Fleetwood house is marital property that should be awarded to Wife. Husband purchased the home in 1988 and renovated it prior to the parties' marriage. The home was listed as Husband's separate property on the prenuptial agreement.[11] Nonetheless, the trial court classified the Fleetwood house as marital property by virtue of transmutation and awarded it to Wife. Specifically, the trial court found that Husband "continued to pay on the property during the marriage" and that the parties "treated the property as the marital residence for the entire duration of the marriage." However, because this decision is in contravention of the parties' valid prenuptial agreement, and the house was not treated as a marital asset, we conclude that the trial court erred.

During divorce, trial courts must classify parties' property as either separate or marital prior to dividing the property between them. *Eldridge v. Eldridge*, 137 S.W.3d 1, 13 (Tenn. Ct. App. 2002). Only marital property is subject to property division, so "it is of primary importance for the trial court to classify property as separate or marital." *Id.* (citing Tenn. Code Ann. § 36-4-121(a)(2001)); *see also Brown v. Brown*, 913 S.W.2d 163, 166 (Tenn. Ct. App. 1994) ("The division of a marital estate necessarily begins with the classification of the parties' property as either marital or separate property."). Separate property is, *inter alia*, "[a]ll real and personal property owned by a spouse before marriage[.]" Tenn. Code Ann. § 36-4-121(a). Separate property can become marital property through transmutation or commingling. Our Supreme Court has explained transmutation and commingling as follows:

---

[11] The trial court's final order provides that "Wife argues that although the property did not appear on Husband's list of assets in the prenuptial agreement, Husband promised the property to her should their marriage be dissolved." The Fleetwood house is listed as Husband's separate property in the prenuptial agreement, so it is unclear whether this was a typo or mistake by the trial court.

Separate property becomes marital property by commingling if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur.... Transmutation occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property.... The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002) (citing 2 Homer H. Clark, *The Law of Domestic Relations in the United States* § 16.2 at 185 (2d ed. 1987)). The doctrines of transmutation and commingling rest on the principle that separate property is not "indelibly separate," but rather can be "'treated in such a way as to give evidence of an intention that it is to become marital property.'" *Carter v. Browne*, No. W2019-00429-COA-R3-CV, 2019 WL 424201, at *9 (Tenn. Ct. App. Feb. 4, 2019) (quoting *Smith v. Smith*, 93 S.W.3d 871, 875 (Tenn. Ct. App. 2002)); *see also Eldridge*, 137 S.W.3d at 13 ("[S]eparate property can become part of the marital estate due to the parties' treatment of the separate property.").

Nonetheless, nothing in the equitable division statute affects "the validity of an antenuptial agreement that is enforceable under § 36-3-501." Tenn. Code Ann. § 36-4-121(g)(2). Valid antenuptial agreements are not inimical to public policy, and "[w]here an antenuptial agreement is valid and enforceable . . . the terms of that agreement regarding distribution of property upon divorce will be applied instead of the statutory definitions of marital and separate property or general principles regarding an equitable distribution." *Swift v. Swift*, No. M2004-01501-COA-R3-CV, 2005 WL 3543341, at *2 (Tenn. Ct. App. Dec. 27, 2005) (citing *Perkinson*, 802 S.W.2d at 603–04); *see also* Tenn. Code Ann. § 36-3-501 (providing that "any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined" to be valid and enforceable); *Randolph*, 937 S.W.2d at 821 ("In the absence of antenuptial agreements, state laws govern the division of marital property . . . in the event of divorce.").

The question before us then is how a valid prenuptial agreement which lists real property as a separate asset of one party affects the classification of that property when the other party claims the property has transmuted. While the parties have cited no cases squarely addressing the facts at hand, this Court has previously dealt with transmutation of a different kind of asset also classified as separate by a valid prenuptial agreement.

- 13 -

In *Estate of Hunt v. Hunt*, we considered the effect of a valid prenuptial agreement on a jointly filed tax return that one party claimed was transmuted from separate property to marital property. 389 S.W.3d 755 (Tenn. Ct. App. 2012). In that case, the valid prenuptial agreement provided that "all wages, and earnings from any source before and during the marriage shall remain the separate property of each party[.]" *Id.* at 757 (internal bracketing omitted). Before passing away in 2008, the husband set up a trust into which his IRA funds were transferred. *Id.* Some of those funds were then paid to the IRS for future tax liability. *Id.* In 2007, the parties had filed a joint tax return, and the wife received the 2007 refund after the husband died. *Id.* The refund was worth over thirty-thousand dollars. *Id.* When the husband's estate made demand for the wife to remit the money to the executor, she refused. *Id.* The executor of the husband's estate then filed a declaratory judgment action seeking "a declaration regarding the rights and obligations of the parties with respect to the 2008 tax refunds, and asserted that the refunds were property of the Estate." *Id.* After a hearing, the trial court awarded the wife a portion of the return money. The husband's estate appealed, challenging whether "the trial court erred in awarding a portion of the 2008 state and federal income tax refunds to [the wife] despite finding the existence of a valid and enforceable Antenuptial Agreement." *Id.* at 758.

The wife argued that the parties' joint filing of the tax return "transmute[d] the tax return into marital property as a matter of law." *Id.* at 761. In analyzing this argument, we looked first to the language of the prenuptial agreement. *Id.* Under that agreement, the parties' wages and earnings from both before and during the marriage were classified as separate property. *Id.* at 757. Another provision of the agreement explained that it would "not be construed as 'waiving (i) any right of the parties to report their income for federal or state income tax purposes in the same manner as permissible for any other husband and wife[.]'" *Id.* Drawing on traditional contract interpretation principles, we concluded that this section "allowed [the parties] to file joint income tax returns as husband and wife, without the joint filing affecting the provisions of the [prenuptial agreement.]" *Id.*

Because the funds from which the return were derived were undisputedly traceable to the husband's separate assets, we explained that that "tax refunds remained the decedent's separate property unless transmuted, as a matter of law, by joint filing[.]" *Id.* In answering that question, we first noted that "Tennessee law is sparse in this area[,]" and then examined relevant portions of the Internal Revenue Code, as well as analogous case law from other jurisdictions. Based on the weight of authority, we concluded that the joint filing did not transmute the return into marital property. *Id.* at 762–63.

Accordingly, in answering the question before it, the *Hunt* Court looked first to the plain language of the parties' prenuptial agreement and then to the applicable law on transmutation. This is similar to the analysis applied in another instructive case, *Wilson v. Moore*, 929 S.W.2d 367 (Tenn. Ct. App. 1996). In that case, we addressed the effect of a valid prenuptial agreement on contributions to a separate retirement account of one of the parties. The husband had a retirement account that was his separate asset per the prenuptial

agreement, but to which he made contributions from his salary during the marriage. Again, we looked first to the language of the parties' agreement, which provided that "increases in the value of their separate property would be considered separate property[,]" but contained another provision that "[the parties] could also accumulate marital property during the marriage." Specifically, the agreement provided:

> Both parties acknowledge that they may accumulate certain other property during their marriage by virtue of their joint efforts. Such property acquired jointly shall not be deemed part of the separate property of the parties discussed herein.

*Id.*

Based on the foregoing, we concluded that the additions to the husband's retirement account were marital property because they came directly from his salary earned during the marriage, and because "[h]is salary was not separate property under either the prenuptial agreement or state law." *Id.* at 374. Because the agreement did not provide otherwise, and because salary earned during a marriage is marital property, the husband could not "place it beyond [the wife's] reach simply by directing that it be deposited into his separate accounts." *Id.*

Although not entirely on point to the case at bar, cases such as *Hunt* and *Wilson* illustrate helpful principles. First, *Hunt* does not foreclose the argument that property named separate in a valid prenuptial agreement can, under some circumstances, transmute into marital property. The *Hunt* Court considered this argument by the wife, framing the issue on appeal as "whether a joint filing transmutes the tax return into marital property as a matter of law." 389 S.W.3d at 761. Indeed, transmutation stems from the concept that treating separate property a certain way creates a presumption that the property has been offered as a gift to the marital estate, *see Langschmidt*, 81 S.W.3d at 747, and holders of separate property are free to give gifts to the marital estate if they so desire.

However, both *Hunt* and *Wilson* also clarify that this question is determined not only through the statutory definitions of marital and separate property or general principles of transmutation, but by first looking to the terms of the prenuptial agreement itself. *See Hunt*, 389 S.W.3d at 761–62; *see also Swift*, 2005 WL 3543341, at *2 (noting that because the agreement at issue was enforceable, this Court's "task [was] to enforce the terms of the agreement in light of the facts in the record"); *Reed v. Reed*, No. M2003-02428-COA-R3-CV, 2004 WL 3044904, at *4 (Tenn. Ct. App. Dec. 30, 2004) ("[W]e will look first to that [prenuptial] agreement to decide to what extent the issues of property classification and division have been previously agreed upon."); *Taylor v. Taylor*, No. M1999-02398-COA-R3-CV, 2003 WL 21302988, at *4 (Tenn. Ct. App. June 6, 2003) ("The cardinal rule of construction is that antenuptial agreements should be construed to give effect to the parties' intentions as reflected in the agreements themselves.") (citing *Sanders v. Sanders*, 288

S.W.2d 473 (1955)); Tenn. Code Ann. § 36-3-501 (providing that trial courts are bound by valid prenuptial agreements when classifying property). We are also mindful that "prenuptial agreements are favored by public policy in Tennessee[,]" and "[c]ontracting parties' intent is embodied in their written agreements" *Wilson*, 929 S.W.2d at 370, 373.

Second, to the extent the terms of a prenuptial agreement do not specifically address the disposition of an asset at issue, the question is then answered with reference to Tennessee law. *See Wilson*, 929 S.W.2d at 373 ("Prenuptial agreements should be construed with reference to the statutes governing the distribution of marital property. They should also be construed using the rules of construction applicable to contracts in general."). For example, in *Wilson*, the disposition of funds deducted from the husband's paychecks and then deposited into an account shielded by the prenuptial agreement were at issue; because the agreement did not provide that the parties' wages were separate property, we relied on Tennessee law in classifying those funds. *See id.*

With this framework in mind, we turn to the Fleetwood house. The language of the Agreement itself is our first inquiry; we "look first to that agreement to decide to what extent the issues of property classification and division have been previously agreed upon." *Reed*, 2004 WL 3044904, at *4. Interpretation of prenuptial agreements is governed by traditional principles of contract interpretation. *See Hunt*, 389 S.W.3d at 758. Our "task is to discern and to honor the intent of the contracting parties[.]" *Id.* (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). The "intent of the contracting parties at the time of executing the agreement should govern." *Id.* (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002)). In ascertaining this intent, we look first to the "usual, natural, and ordinary meaning of the language used." *Id.* (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). When the terms of the contract are clear and unambiguous, we ascertain the parties' intent from those terms. To the extent the terms are ambiguous, however, we must apply "established rules of construction to determine the intent of the parties." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) (citing *Planters Gin Co.*, 78 S.W.3d at 889–90). For example, "when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct . . . to guide the court in construing and enforcing the contract." *Id.* at 612 (citing *Memphis Housing Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001)).

As relevant, the Agreement provides:

> WHEREAS, [Husband] desires that all his Separate Property . . . shall be free from any claims of [Wife] that may arise by reason of their contemplated marriage[;]
>
> \*       \*       \*
>
> "Separate Property of [Husband]" shall mean: (i) all real and

- 16 -

personal property owned by [Husband] at the time of his marriage to [Wife];

*     *     *

(d) In the event the marriage between [Wife] and [Husband] is unsuccessful for any reason and results in their divorce or the refusal of either or both of them to live together as husband or wife, [Wife] hereby waives and releases any and all right and interest, statutory and otherwise, under the laws now or hereafter in effect in any jurisdiction, which she may have in the Separate Property of [Husband].

*     *     *

4. Separate Property. Each of the parties shall have the absolute right to manage, dispose of, or deal with his or her separate property, in any manner whatsoever, free from any claims by the other and with the same effect as if no marriage had been consummated between them.

The foregoing provisions undercut Wife's argument that the Fleetwood house, Husband's separate asset, transmuted into marital property. The Agreement provides Husband the right to treat the Fleetwood house "in any manner whatsoever" while remaining free from such a claim by Wife. These portions of the Agreement reflect the parties' intent that their separate assets remain separate, notwithstanding how the assets were managed or dealt with. Insofar as transmutation of real property turns squarely on how parties manage and deal with their property, the above provisions bear heavily on the question before us.

On the other hand, the Agreement contains no express provisions addressing transmutation or commingling, or the extent to which the parties might accumulate marital property. Nor does the Agreement foreclose the possibility of gifts by either party to the marital estate. Further, despite the agreements in those cases being more specific than the terms at issue here, neither *Hunt* nor *Wilson* were decided without reference to the applicable law on transmutation or commingling. In the absence of clearer contractual terms, it is prudent to at least consider Wife's argument that Husband's conduct and statements with regard to the Fleetwood house indicate an intent to gift that asset to the marital estate.

Even assuming that Wife's argument is not foreclosed by the parties' enforceable contract, however, the typical badges of transmutation are not strong in this case. The factors we look to when considering transmutation of a home include: "(1) the use of the property as a marital residence; (2) the ongoing maintenance and management of the property by both parties; (3) placing the title to the property in joint ownership; and (4) using the credit of the non-owner spouse to improve the property." *Hayes v. Hayes*, No.

- 17 -

W2010-02015-COA-R3-CV, 2012 WL 4936282, at *12 (Tenn. Ct. App. Oct. 18, 2012) (quoting *Fox v. Fox*, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *5 (Tenn. Ct. App. Sept. 1, 2006)). We noted in *Dover v. Dover* that "[t]ransmutation often occurs when a spouse purchases real property prior to the marriage and the parties then use the property as the marital residence and undertake significant improvements to the property during the marriage." No. E2019-01891-COA-R3-CV, 2020 WL 7224368, at *5 (Tenn. Ct. App. Dec. 8, 2020) (collecting cases). In that case, the home at issue was purchased by the husband prior to the parties' marriage, but the parties substantially renovated the home together, and there was evidence that the wife contributed greatly to the renovations and ongoing maintenance of the home. *Id.* at *6–7. Additionally, a HELOC was taken out on the home and the parties used the funds to purchase vehicles and pay outstanding bills from the wife's previous divorce. *Id.* Consequently, we concluded that the home transmuted into marital property. *Id.*

Here, Husband purchased, renovated, and furnished the Fleetwood house before the parties married. It is undisputed that the parties did not undertake substantial renovations to the property during the marriage; rather, the only changes to the home during the marriage were the construction of a small greenhouse, a playhouse for the parties' children, and touch-ups to the bathrooms such as the replacement of shower doors. In fact, Wife adamantly maintained at trial that the Fleetwood house is in desperate need of updating and repairs. *See Treadwell v. Lamb*, No. M2015-01391-COA-R3-CV, 2017 WL 945940, at *7 (Tenn. Ct. App. Jan. 19, 2017) (taking the disrepair of the property into account when considering whether transmutation occurred). There is also little to no evidence about the parties' maintenance of the home overall, and it is undisputed that the parties kept a housekeeper, gardeners, and landscapers. While these expenses were presumably paid with marital funds, the proof on this topic is paltry. Husband never re-titled the home in Wife's name, and there is no evidence Wife's credit was used to improve the home. *See id.*

In support of her argument, Wife points to Husband's testimony that he "briefly" financed the home at one point, as well as the amendment to a deed of trust secured by a promissory note for $200,000.00, the collateral for which was the Fleetwood house. Husband testified that the note was "probably" repaid with money earned from his salary. The date on the amendment is May 29, 1992, and it refers to a note dated May 14, 1991. Nonetheless, this single fact does not warrant a finding of transmutation in defiance of the prenuptial agreement, nor does the record support the trial court's finding that Husband "continued to pay on the property during the marriage." *See id.*, at *7–8 (rejecting wife's argument that family residence transmuted to marital property where husband purchased the home prior to marriage and later used the property as collateral on a loan). The amendment is in Husband's name, and there is no evidence of Wife's involvement other than the fact that the parties were married May 2, 1992. The amendment was executed in the earliest days of the parties' marriage and its connection to Wife is tenuous. This is especially true in light of the Agreement's provision that Husband had the "absolute right

- 18 -

to manage . . . or deal with his . . . separate property, in any manner whatsoever, free from any claims" by Wife.

This logic also applies to Wife's claim that Husband's willingness to let her remain in the home shows transmutation. Although Husband did not deny at trial that Wife is free to continue living in the Fleetwood house, he has also consistently maintained that the home is a separate asset and requested that the fair market rental value of the home be deducted from his alimony obligation. Overall, Husband's conduct throughout the marriage does not suggest an intent to treat the Fleetwood house as part of the marital estate and is instead consistent with the terms of the Agreement.

Accordingly, Wife's argument not only suffers from lack of proof, but is also inconsistent with the prenuptial agreement that she entered into freely, voluntarily, and without duress or undue influence. More fundamentally, were we to endorse Wife's argument in this case, it would suggest that a home listed as a separate asset in a valid, enforceable prenuptial agreement transmutes into marital property simply by virtue of a married couple residing in the home together. A home "'should not be classified as marital property simply because the parties have lived in it.'" *Treadwell*, 2017 WL 945940, at *7 (quoting *Takeda v. Takeda*, No. E2006-02499-COA-R3-CV, 2007 WL 4374036, at *3 (Tenn. Ct. App. Dec. 17, 2007)). Such a holding would effectively nullify any reason to list a separately held home in a prenuptial agreement, or even chill parties' plans to live together as an intact family in one home. *See Wilson*, 929 S.W.2d at 370 (explaining that prenuptial agreements are favored by public policy in part because "[t]hey benefit the parties by defining their marital rights in property which tend to be among the most frequent causes of family discord").

In light of the trial court's finding that the Agreement was valid, its terms were binding on the trial court. Tenn. Code Ann. § 36-3-501. Based on the conduct and statements of the parties regarding the Fleetwood house, we construe the Agreement as preserving the home as Husband's separate asset. Accordingly, the Fleetwood house is Husband's separate property, and the trial court erred in classifying it as marital property.

### c. The Fidelity accounts

Next, Wife asserts that the trial court erred in classifying two accounts as Husband's separate assets – the Fidelity investment account ending in 6395, and the Fidelity checking account ending in 2888. At the outset, we note that our review of the trial court's rulings on the Fidelity accounts is hampered by the record's lack of clarity as to these accounts. There are four separate Fidelity accounts, each with its own account number, and Husband testified that the accounts were used for different purposes. Nonetheless, repeatedly and nearly always during his testimony, Husband referred to the accounts collectively as "the Fidelity account." Overall, it is difficult to discern from Husband's testimony which Fidelity account he is referring to at any given point. Wife acknowledges this in her brief,

noting that while she is appealing only the disposition of the checking account and the investment account, she adopts Husband's "shorthand" and refers to those two accounts as "the Fidelity account." Consequently, we understand the issue before us to be whether the trial court correctly classified the Fidelity checking account and the Fidelity investment account as Husband's separate assets.

### i. The Fidelity checking account

The Fidelity checking account was not specifically listed in the Agreement as Husband's separate asset.[12] The trial court's findings and conclusions regarding this account were as follows:

> Wife argues that this asset is marital because it is not listed in the prenuptial agreement. Wife values this account at $16,493. Wife argues that this asset should be awarded Husband.

> Husband argues that this was solely his account. Husband values this property at $16,492.96.

> The Court finds that this account is Husband's separate property because Wife has not carried her burden to show that the account was marital; thus, this account is not subject to division. Based on the evidence presented and the parties' near-agreement, the Court finds this property has a value of $16,492.92.

As best we can discern,[13] Husband argues that all of the Fidelity accounts were funded in large part by the sale of the Downtown property, which was undisputedly a separate asset. Wife asserts that the checking account was inextricably commingled with marital funds and therefore became marital property. Because of Husband's failure to differentiate between the Fidelity accounts and trace the funds going in and out of the Fidelity checking account, Wife has the better argument.

To reiterate, "'[m]arital property' means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce." Tenn. Code Ann. § 36-4-121(b)(1)(A). Separate property includes, *inter alia*, "[a]ll real and personal property owned by a spouse before marriage[.]" Tenn. Code Ann. § 36-4-121(b)(2)(A). A party seeking to bring the other party's separate property into the marital estate bears the "burden of proving that the

---

[12] The Agreement mentions only the "Fidelity Investments – USA account" and the "IRA – Fidelity Funds."

[13] Again, both parties refer to the Fidelity accounts as one account throughout their briefing.

- 20 -

property fits within the statutory definition of marital property." *Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007) (citing *Kinard v. Kinard*, 986 S.W.2d 220, 232 (Tenn. Ct. App. 1998)).

Nonetheless, "separate property becomes marital property by commingling if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur[.]" *Langschmidt*, 81 S.W.3d at 747. Assets acquired prior to marriage are presumed separate property, and the party seeking to prove otherwise must show, by a preponderance of the evidence, the transmutation or commingling. *Daniel v. Daniel*, No. M2006-01579-COA-R3-CV, 2007 WL 3202778, at *5 (Tenn. Ct. App. Oct. 31, 2007). When the evidence demonstrates an intention that an asset become marital property, the party claiming the asset is separate may rebut the presumption with "evidence of circumstances or communications clearly indicating an intent that the property remain separate." *Langschmidt*, 81 S.W.3d at 747.

There are multiple problems with Husband's argument that the checking account is properly classified as separate property. First, while the Fidelity investment account and the Fidelity IRA were both listed in the Agreement as Husband's separate assets, it is unclear whether the checking account was included in those funds. Husband did not clarify this at trial, and the face of the Agreement itself is unclear as to this point.[14] The Agreement makes no mention of the checking account, and there is little to no evidence in the record about when the checking account was opened or the circumstances of same.

Second, even if the checking account began as a separate asset, the funds in the Fidelity checking account were commingled with marital funds. This conclusion is primarily based upon Husband's failure to differentiate the Fidelity accounts and the funds therein at trial. Accordingly, the question is not whether Wife satisfied her burden of showing that a separate asset became marital, but rather whether Husband rebutted the presumption that the checking account was a marital asset by clearly indicating his intent that the account remain separate. *Langschmidt*, 81 S.W.3d at 747.

Here, *Eldridge v. Eldridge* is instructive. 137 S.W.3d 1 (Tenn. Ct. App. 2002). In that case, we addressed the doctrine of commingling as it related to investment accounts acquired prior to the parties' marriage. The husband did not keep the funds in his two purportedly separate accounts segregated; used the separate funds to pay the parties' expenses and purchase marital property; and could not clearly match marital deposits with their destinations. *Id.* at 17. We agreed with the wife that the funds in the two accounts had become inextricably commingled, explaining that:

---

[14] The Fidelity accounts have different account numbers, and Husband produced different statements for the investment account and the checking account.

- 21 -

[w]hen [h]usband combined his separate funds with the couple's marital funds, he jeopardized the identity of his separate funds. In order for [h]usband to prevent his separate funds from becoming marital property, [h]usband had to illustrate that the separate property was not *inextricably* mingled with the couple's marital property. Husband could accomplish this by demonstrating that the property continued to be segregated or by demonstrating that the separate funds could be traced into their product. From our review of the record, [h]usband failed to accomplish this task.

\* \* \*

Husband claimed to use separate funds in conjunction with marital funds when paying expenses and purchasing marital property. However, from our review of the record, we cannot say with any certainty that the marital funds left the account with the separate property. The marital funds may very well have remained in the accounts. This is due to the fact that Husband could not clearly match the marital deposits with their ultimate destination. If the marital deposits could not be matched to their destination, we must conclude that the accounts were inextricably commingled.

*Id.* (emphasis in original).

As in *Eldridge*, in the case at bar, Husband has failed to "illustrate that the separate property [in his checking account] was not *inextricably* mingled with the couple's marital property." *Id.* (emphasis in original). Albeit vague and confusing, Husband's testimony at trial generally provided that both separate and marital funds flowed in and out of the Fidelity accounts, including the checking account, and that when Husband received income of any kind, it was likely deposited into one or more of the Fidelity accounts. For example, some of the profits from the sale of the Downtown property were deposited into the checking account. Husband also indicated that his salary earned during the marriage went into the Fidelity accounts.[15] Husband testified that his tax returns[16] would likely have been deposited into the checking account and then perhaps transferred to other Fidelity accounts. Additionally, the parties' normal expenses, such as car payments, are drawn out of the checking account. To further complicate matters, Husband uses the Fidelity checking account to transfer money to the parties' children through another conduit checking account with USAA. Based on the state of the record before us, there is simply no way to discern the source or character of the funds in Husband's Fidelity checking account.

---

[15] The Agreement does not provide that wages earned during the marriage remain separate property, nor is this the law in Tennessee. *See Wilson*, 929 S.W.2d at 374.

[16] Husband could not recall specifically which returns were filed as joint or separate. The record shows that from 1999-2004, the parties filed joint tax returns. Later in their marriage, however, some returns were prepared as "married filing separately."

Nor has Husband clarified this question on appeal. Rather, Husband points to his testimony that in 2007, his financial situation was poor and that he had to liquidate all of his assets in order to keep his businesses afloat. In essence, Husband argues that he had a clean slate starting in 2007 and that because the parties essentially lived off returns on Husband's investments after that point, whatever marital funds existed in the accounts are gone and only separate property remains. Without careful tracing, however, this argument only further muddies the water. Notably, in his reply brief to this Court, Husband appears to acknowledge that commingling occurred during the marriage:

> However, although commingling may have occurred at some time in the marriage, the identification of what commingling may have existed during the relevant time period was absent from the evidence in the case. The reasonableness of the Trial Court's finding can be seen comparing the immense contribution to the value of the account in the short space of time prior to the trial of the case that began on July 5, 2019 to the amount that was in the account at trial. With some reasonable accounting for the capital gains tax that would be due on the $8,648,589.70 gross proceeds from the sale and with no other testimony about deposits to the Fidelity Investments account[17] that may have been marital property, the magnitude of any commingling would be so slight as to be insignificant in the analysis. It should not be as if a relatively small amount of marital property should infect the entire fund so as to transmute the entirety.

The husband in *Eldridge* made a similar argument, asserting that because "the outflow of money toward marital expenses outweighed any deposits or earnings that could be classified as marital property, [ ] the remaining funds must be his separate property." 137 S.W.3d at 18. We explained:

> This argument fails to demonstrate that the funds were not commingled. Any argument based on tracing must be more certain. After [h]usband combined the marital and separate property, he had the obligation to establish that the two sources of funds were not inextricably commingled. Husband cannot accomplish this task by merely relying on the fact that the marital withdrawals outweighed the marital deposits.

*Id.*

Likewise, here we are unpersuaded that because one deposit was so large, the entirety of the Fidelity checking account should be considered Husband's separate

---

[17] Again, Husband appears to be referring to more than one Fidelity account. This portion of Husband's briefing is in reply to Wife's argument that both the Fidelity checking and investment account were inextricably commingled.

property.  Husband "had the obligation to establish that the two sources of funds were not inextricably commingled[,]" and he "cannot accomplish this task by merely relying" on the fact that a separate deposit was more substantial than any marital property.  *Id.*

Husband's treatment of the Fidelity checking account raised a rebuttable presumption that the account was marital property.  He did not rebut this presumption at trial, and the trial court erred in determining that it was Wife's burden to show otherwise.  Consequently, the Fidelity checking account was incorrectly classified as Husband's separate property.  It is a marital asset subject to division.

### ii. The Fidelity investment account

We turn next to the Fidelity investment account, our review of which was also difficult for the reasons already addressed.  Moreover, unlike the checking account, the Fidelity investment account was listed in the prenuptial Agreement.  Regarding this account, the trial court found:

> Wife argues that this is a marital asset. Wife values this property at $5,250,141. Wife argues that while this property was listed in the prenuptial agreement at a value of $178,000, the account is now marital as a result of commingling. Wife argues that Husband used the account to deposit all of his earnings and the money from the sales of other assets. Wife argues that Husband has admitted that [he] cannot differentiate between money he earned during the marriage and deposited into the account and money deposited from sales of separate property that would not be subject to division. Wife points to Husband's available tax returns to show that Husband had significant income during the marriage; for example, Husband's Adjusted Gross Income from 1999 to 2003 averaged to $695,876.60 per year. Wife argues that [H]usband's income was substantial and consistently deposited into this account and is marital property. Wife argues she should be awarded this asset.

> Husband argues that this account is separate property because the vast majority of the funding for this account came from the Newton Chevrolet real estate sales. Husband values this property at $5,195,129.65.

> The Court finds that $8,648,589.70 should be subtracted from the value of this asset as the separate property of Husband from the sale of Newton Chevrolet. Because this subtraction renders this asset at a negative balance, the Court finds that this asset cannot be divided, even though Husband likely commingled funds in this account throughout the marriage. Thus, this asset has zero value to either party for the purposes of distribution.

- 24 -

Like the Fleetwood house, this asset's inclusion in the Agreement complicates our analysis. Unlike the Fleetwood house, however, Husband's conduct and treatment of the investment account clearly evinces an intent to treat it as a part of the marital estate; indeed, even the trial court noted that the funds in the account were likely commingled. While the Agreement provides that Husband may treat his separate assets in any manner he chooses, free from claims against the assets by Wife, the Agreement does not prohibit Husband from gifting his separate property to the marital estate. Further, as addressed at length above, there are no specific provisions in the Agreement explaining the extent to which the parties may accumulate marital property or whether Husband's salary and wages earned during the marriage remain separate.

Insofar as Husband deposited marital funds, including his salary, into one or more of the Fidelity accounts during the marriage and admits to transferring money between those accounts, the funds in the investment account were inextricably commingled. *See Wilson*, *supra*. In *Wilson*, we explained:

> Mr. Wilson asserts that the contributions to his retirement accounts during the marriage should not be subject to division as marital property because they were "increases" or "additions" to accounts he owned prior to the marriage. Ms. Moore, on the other hand, contends that these contributions were marital property because they came from salary Mr. Wilson earned during the marriage. Ms. Moore has the better argument.

> \*      \*      \*

> Mr. Wilson's contributions to his retirement accounts came directly from the salary he earned during the marriage. His salary was not separate property under either the prenuptial agreement or state law. It was not covered by the agreement because it was not part of Mr. Wilson's premarital estate and because he did not receive it by inheritance or gift. Likewise, it did not fit within the definition of separate property in Tenn. Code Ann. § 36-4-121(b)(2) but rather was marital property for the purposes of Tenn. Code Ann. § 36-4-121(b)(1)(A).

> Since Mr. Wilson's salary earned during the marriage was marital property, Mr. Wilson could not place it beyond Ms. Moore's reach simply by directing that it be deposited into his separate accounts.

929 S.W.2d at 373–74.

This analysis is instructive despite the fact that *Wilson* dealt with slightly different facts. In that case, the funds at issue were traceable directly to the husband's salary, whereas here, Husband maintains that the funds at issue in the investment account are

- 25 -

directly traceable to the sale of a separate asset, the Downtown property.  This distinction is inapposite, however, because the funds in the Fidelity investment account were inextricably commingled throughout the marriage and before the sale of the Downtown property.  At the time of the marriage, the investment account contained $178,000.00.  When asked about this, Husband testified that "all money is fungible" and that the money originally in the investment account was likely spent on living expenses.  When questioned about whether he could differentiate money in the investment account from salary earned and deposited during the marriage, he stated that he could not.  In this sense, *Wilson* is helpful in providing that Husband cannot place marital assets beyond Wife's reach by placing them in a separate account shielded by the Agreement, and then failing to carefully trace and segregate the purportedly separate funds.

In that vein, Husband's overall testimony regarding the investment account renders it impossible to discern the origin of the funds in that account.  Importantly, Husband testified that he transferred money between the Fidelity checking account and the investment account.  When asked about his income generally by the trial court, Husband replied, "If it comes to me, it goes into my Fidelity accounts, Your Honor."  The vague and equivocal testimony about these accounts reflects that the funds therein cannot be traced, and the testimony that money was transferred between the checking and investment account is critical inasmuch as it has already been established that the funds in the checking account were inextricably commingled throughout the marriage.  We agree with Wife's characterization of the Fidelity accounts as a "catch-all" repository for both marital and separate funds.

On appeal, Husband relies on his testimony that the investment account was primarily funded by the profits from the sale of the Downtown property.  Nonetheless, the money in the investment account was already inextricably commingled by the time this sale occurred, and the record does not show that Husband segregated or carefully traced those profits.  Indeed, some of the profits were also deposited into the checking account, a mixed asset, and Husband testified to making transfers between the checking and investment accounts.

Unlike the Fleetwood house, Husband's conduct and statements regarding the Fidelity investment account bely his argument that this asset was intended to remain separate under the Agreement.  His conduct does not show an intent to keep this account separate, but rather establishes an intent that the asset become part of the marital estate.  There is no evidence of any tracing whatsoever by Husband throughout the marriage, and both the trial court and Husband have acknowledged that commingling occurred on some level.  Notwithstanding the Agreement, we cannot conclude that whatever marital funds remain in the Fidelity investment account are out of Wife's reach under the particular circumstances of this case.

The trial court erred in classifying the Fidelity investment account as a separate

asset. It is a marital asset subject to equitable division.

### d. FirstBank custodial account

Next, Husband argues that the trial court erred in classifying the FirstBank custodial account as a marital asset. Here, the trial court found:

> Based on the evidence and testimony presented, the Court finds that account is marital property. The account was created during the marriage to finance a purchase made during the marriage; logically, if the Scenic Highway property is marital property, then the money that financed the purchase is also marital. Based on the evidence and the parties' near-agreement, the Court finds that this account has a value of $914,743.76. The Court awards this account to Wife because Wife should not be responsible for buying Husband a house — thus, the money for the Scenic Highway property should not come out of Wife's property award.

The FirstBank account was opened while the divorce was ongoing in the trial court. When Husband sought permission from the trial court to purchase the Scenic Highway house, the trial court granted Husband's request but ordered Husband to put an amount equal to the purchase price of the house into a custodial account. It is undisputed that Husband transferred the money out of the Fidelity investment account into the FirstBank account. On appeal, Husband asserts that the trial court's reasoning is flawed and that the account having been opened during the marriage is not dispositive. Husband argues that the court should have looked at the origin of the funds transferred to determine whether they were marital or separate. As Husband maintains on appeal that the Fidelity investment account is separate property, he also maintains that the money in the FirstBank account is separate property.

Here, we agree with Husband that the trial court's reasoning was flawed, but we agree with the trial court's conclusion that the FirstBank account is a marital asset. *See, e.g.*, *Wilson*, 929 S.W.2d at 374 (noting that accounts opened by husband during marriage and funded with money from a separate farming venture were not marital assets simply by virtue of being opened during the marriage); *Wade v. Wade*, 897 S.W.2d 702, 716 (Tenn. Ct. App. 1994) (salary earned during marriage was marital asset regardless of which bank account it was deposited into). As addressed at length above, the money in the Fidelity investment account has been inextricably commingled and should have been classified as marital property. Accordingly, the money transferred directly out of the Fidelity investment account and into the FirstBank custodial account is no different.

Consequently, we affirm the trial court's finding that the FirstBank account is a marital asset subject to division.

In sum, the trial court erred in its classification of the Fleetwood house, the Fidelity checking account, and the Fidelity investment account. The Fleetwood house is Husband's separate property, was not subject to division, and should not have been awarded to Wife. The Fidelity investment account and the Fidelity checking account are marital assets subject to division. The classification and award of these three assets is vacated, and on remand the trial court must equitably divide the two Fidelity accounts at issue according to the factors set forth in Tenn. Code Ann. § 36-4-121(c). In doing so, the trial court must consider those assets already awarded to the parties and not addressed in this appeal.[18] *See id.*

### e. Remaining issues

#### i. Alimony

As an alternative to her argument regarding the Fidelity accounts, Wife argues that the trial court erred in only awarding Wife $4,500.00 per month in alimony *in futuro*. Stated differently, Wife asserts that if this Court concludes the Fidelity accounts are Husband's separate property, Wife is entitled to increased alimony *in futuro* in the amount of $11,694.00 per month. We conclude that because the trial court's classification of several major assets was in error, the spousal support determination should be vacated and remanded.

When a trial court determines whether and to what extent alimony is appropriate, it must apply the statutory factors enumerated in Tenn. Code Ann. section 36-5-121(i). Rather than tax the length of this opinion with a discussion of these factors, we note at the outset that one of the alimony factors is "the provisions made with regard to the marital property, as defined in § 36-4-121." Tenn. Code Ann. § 36-5-121(i)(8). The trial court must consider the manner in which the marital estate is divided when determining alimony, and "the trial court may award spousal support only after the court has equitably divided the parties' marital property." *Trezevant v. Trezevant*, 568 S.W.3d 595, 624 (Tenn. Ct. App. 2018); *see also Dover*, 2020 WL 7224368, at *16 (vacating and remanding for reconsideration of spousal support where classification of several major assets was reversed). As such, it is sometimes necessary to remand a trial court's decision on alimony "by virtue of the need to re-evaluate the marital estate." *Trezevant*, 568 S.W.3d at 624.

In the present case, our decision to remand this matter for reconsideration of the division of marital property substantially alters the equities between the parties. While the

---

[18] To reiterate, the trial court awarded Husband $1,835,191.97 in assets from the marital estate, and awarded Wife $2,996,984.36 in assets from the marital estate. While the parties seem to disagree slightly on the value of certain assets, neither party has raised an issue regarding valuation on appeal. Because the trial court already deducted the dissipated assets from Husband's award, this factor need not be readdressed with regard to the Fidelity accounts on remand.

award of the Fleetwood house to Wife substantially lowered her monthly expenses, we have determined that house is Husband's separate property and not subject to division. Accordingly, Wife's need for and Husband's ability to pay alimony is likely to change on remand, and Wife's living situation must be accounted for in the reconsideration of spousal support. Consequently, we vacate and remand the trial court's decision as to Wife's award of alimony *in futuro*. Because an award of attorney's fees is considered a form of alimony in divorce cases, the award of Wife's attorney's fees is also vacated. *See Barton v. Barton*, No. E2019-01136-COA-R3-CV, 2020 WL 6580562, at *11 (Tenn. Ct. App. Nov. 10, 2020) (vacating the trial court's award of attorney's fees to wife after determining that issues of equitable property distribution required reconsideration).

### ii. Attorney's fees

Wife has requested her attorney's fees incurred on appeal. "The determination of whether to award attorney's fees on appeal is within the sole discretion of the appellate court." *Trezevant*, 568 S.W.3d at 641 (citing *Moses v. Moses*, No. E2008-00257-COA-R3-CV, 2009 WL 838105, at *10 (Tenn. Ct. App. Mar. 31, 2009)). Under all of the circumstances, we decline to award Wife her attorney's fees incurred on appeal.

### CONCLUSION

The ruling of the Hamilton County Chancery Court is affirmed in part, reversed in part, vacated in part and remanded for proceedings consistent with this opinion. Costs of this appeal are assessed one-half to the appellant, Halbert Grant Law, Jr., and one-half to the appellee, Barbara Matthews Law.

_____

KRISTI M. DAVIS, JUDGE